**TODD SHIPYARDS CORPORATION,**
Plaintiff-Appellee Cross Appellant,

v.

**TURBINE SERVICE, INC., et al., and the Travelers Insurance Company, Defendants-Appellees Cross Appellants,**

Sentry Insurance Company, et al., Defendants-Appellants Cross Appellees,

Auto Transportation, S.A., Intervenor-Appellee Cross Appellant.

**TURBINE SERVICE, INC. and the Travelers Insurance Co.,**
Plaintiffs-Appellants,

v.

**The Vessel, S/S KATRIN,**
Defendant-Appellee,

Auto Transportation, S.A., Intervenor-Appellee Cross Appellant.

No. 79–1685.

United States Court of Appeals, Fifth Circuit.

April 29, 1982.

Rehearing and Rehearing En Banc Denied June 14, 1982.

and for detention in the amount of $963,-523.20, and granting Todd Shipyards Corporation indemnity from Turbine Service, Inc. and Gonzales Manufacturing and Industrial Machine Works, Inc. and their respective underwriters, The Travelers Insurance Company and Sentry Insurance Company. The judgment exonerated the defendants from any liability resulting from the failure of the ships turbines which occurred off the coast of Cork, Ireland. No party is satisfied and all parties, except the insolvent Turbine Service, Inc. appeal. Except for Todd who concedes that the findings of fact are not clearly erroneous, the parties challenge many of the district courts 181 findings of fact and virtually all of the courts conclusions of law.[1]

We affirm the judgment in favor of the defendants with respect to the Cork casualty. We affirm the judgment in favor of Auto Transportation and against all defendants with respect to liability. We modify the judgment with respect to damages. We reverse the judgment holding inapplicable one of the exclusions in the policies of Travelers and Sentry.

Hulse, Nelson & Wanek, John I. Hulse, IV, New Orleans, La., for Sentry Ins. Co.

Phelps, Dunbar, Marks, Claverie & Sims, James B. Kemp, Jr., New Orleans, La., Richard A. Hagen, New York City, for Todd Shipyards.

Fred E. Salley, New Orleans, La., for Turbine Service and Travelers Ins.

Donald F. Mooney, New York City, Francois Allain, New Orleans, La., for Auto Transp., S.A.

Deutsch, Kerrigan & Stiles, Allen F. Campbell, New Orleans, La., for Gonzales.

Before DYER *, SAM D. JOHNSON and WILLIAMS, Circuit Judges.

DYER, Circuit Judge:

In this appeal we review the judgment of the district court holding Todd Shipyards Corporation liable to Auto Transportation, S.A., for damage to its vessel S/S KATRIN

■ At the outset it bears noting once again that findings of fact made in an admiralty case are binding unless clearly erroneous. *Fisher v. Agios Nicolaos V*, 628 F.2d 308 (5th Cir. 1980). And questions concerning the amount of damages, the existence of negligence and proximate causation are treated as factual issues and are thus subject to the clearly erroneous standard. *General Intermodal Logistics Corp. v. Mainstream Shipyards and Supply, Inc.*, 666 F.2d 129, 131 (5th Cir. 1982); *Pluyer v. Mitsui O.S.K. Lines, Ltd.*, 664 F.2d 1243, 1247 n.4 (5th Cir. 1982); *Florida East Coast Railway Company v. Revilo Corp.*, 637 F.2d 1060, 1067 (5th Cir. 1981); *Noritake Co., Inc. v. M/V Hellenic Champion*, 627 F.2d 724, 728 (5th Cir. 1980).

---

* Circuit Judge of the Eleventh Circuit, sitting by designation.

1. The trial of this blockbuster maritime action began on November 14, 1977 and ended May 23, 1978. There were 67 days of trial, 28 witnesses, over 7,000 pages of depositions and more than 600 exhibits offered. The record on appeal is contained in 83 volumes.

The KATRIN was purchased by Auto Transportation, S.A. (Owners) early in 1973. In 1975 a contract was entered into between Todd Shipyards Corporation (Todd) and Owners for the performance of bulkhead and boiler repairs, and to open the turbines for examination. The contract contained Todd's "red letter" terms and conditions. The boiler and bulkhead repairs were accomplished without incident and have no bearing on this litigation.

The low pressure (LP) turbine was opened up by employees of Turbine Service, a subcontractor with whom Todd had dealt on prior occasions. It was found badly damaged and an agreement was subsequently made by Todd and Owners to effect permanent repairs to the LP turbine. These repairs consisted, in part, of removing four rows of the LP turbine for a complete renewal. Necessary blading was to be manufactured. The remaining turbine blading was to be faired, dressed and renewed. Other blading in the LP rotor and stator (stationary part of the turbine) were to be removed, faired and reinstalled in good order. Because Todd's labor force was occupied and its shops were crowded, Todd engaged Turbine Service to perform the necessary work.

There were insufficient spare blades aboard the vessel to supply the necessary replacements and Todd was unable to locate such blades. Turbine Service obtained replacement blades that were not compatible with the turbine and had to be modified for insertion in the turbine by milling off the blade roots and welding the old roots to the new blades. The welding work was performed by Gonzales without the knowledge of Todd or the Owners under a subcontract from Turbine Service in violation of the terms of the Todd purchase order.

Turbine Service directed Gonzales not to apply weld material to either the airfoil or the blade roots, as this would entail a considerable amount of machining to return the blades to their original design. A penetration weld was rejected by Turbine Service because of the time and cost involved, so a fillet weld was made on two sides of the rectangular shaped section where the airfoil base joined the old root, and a fusion patch (or edge weld) was made on the other two sides where the leading and trailing edges of the blade met the top of the root. Spacer rings were manufactured by Gonzales and installed in the turbine casing by Turbine Service and Gonzales to reduce the clearance between the modified rotor blades and the casing because the replacement blades were shorter than the originals.

Turbine Service did not know the components of the metal of the old roots and the new airfoil. Gonzales assumed that the metals were dissimilar and although the manufacturer's manual recommended a 309 rod, Gonzales used a 308 rod because there were no 309 rods in stock. It was later discovered that the blades and roots were 410 which requires pre-heating, post-heating and stress relieving, but Gonzales had no facilities to do such testing.

Turbine Service informed Gonzales that it would have tests run on the blades and obtain approval from Todd and Owners. Turbine Service never had the blades tested, and when it submitted a work list to Owners, it referred to "new blades manufactured" and failed to disclose the modifications of the blades by welding to either Todd or Owners.

Gonzales machined and welded the fabricated blades in four rows of the rotor, manufactured spacer rings according to measurements given to it by Turbine Service, and installed those rings. It balanced both the HP and LP rotors on its balancing equipment. On completion of this work, Gonzales obtained a release from liability from Turbine Service.

After reinstallation, the turbine was closed up in the vessel by Turbine Service, but with some difficulty because of a pre-existing distortion of the casing. The KATRIN satisfactorily passed a dock trial but on the river trial noises were heard inside turbine. Upon return to Todd's shipyard, the LP turbine was opened and it was discovered that there was a failure of the welds in two rotor blades, and the broken blades caused all the ensuing damage.

Owners elected to ship the LP turbine to its original manufacturer, Siemens, A.G. in Germany (Siemens) for rebuilding. Eight months later the LP turbine was returned to New Orleans and reinstalled by Ardell Engineering. On examination of the HP turbine, which had remained in place in New Orleans, it was disclosed that the gap between the tips of the rotor blades and the outer casing of the turbine (referred to as "clearances"), were excessive. Despite this discovery, Owners decided to let the vessel sail from New Orleans in March of 1976.

The KATRIN traded commercially for the next four months, experiencing excessive temperature in the condensor top. In July, 1976, passing the Irish coast at Cork, the turbines suddenly seized and stopped. The vessel began drifting towards the coast and the danger was such that the master ordered the chief engineer to try to operate the turbines, no matter what their condition, in order to save the ship and crew. The chief engineer started the turbines and operated them long enough to bring the vessel away from the coast and subsequently into the Cork harbor. The damage to the HP and LP turbines due to this casualty was so extensive that the vessel was sold for scrap.

This litigation was initiated by Todd in June 1975. It brought suit against Turbine Service and Gonzales, demanding return of the KATRIN's damaged turbine parts which had been removed after the river trial casualty and taken to the shops of Turbine Service and Gonzales. Both Gonzales and Turbine Service responded by asserting a lien for monies due from Todd on prior invoices for work done on the turbines. Owners then intervened. Turbine Service's insurer, Travelers and Gonzales' insurer, Sentry, were brought into the case.

Despite the manner in which the action was initiated, it is actually a suit by Owners to recover for damage to the KATRIN. The parties claims, counterclaims and cross claims at trial were as follows:

(1) Owners sought to recover from all other parties approximately $3.5 million dollars for the cost of repairing the KAT-RIN's LP turbine in Germany, loss in the vessel's value by reason of the Cork casualty, loss of use of the vessel during the various repair periods, and related expenses.

(2) Todd sought to recover from Owners its unpaid repair invoices, and sought indemnity from Turbine Service/Travelers and Gonzales/Sentry in the event that Todd was found liable to Owners.

(3) Turbine Service/Travelers sought indemnity from Gonzales/Sentry for negligent workmanship by Gonzales and sought to recover from Todd and Owners unpaid repair invoices.

(4) Gonzales/Sentry sought to recover unpaid repair invoices from all other parties, and sought indemnity from Turbine Service in the event that Gonzales/Sentry were found liable to Owners or Todd.

The district court made findings of fact and conclusions of law, *Todd Shipyards Corp. v. Turbine Service, Inc.,* 467 F.Supp. 1257 (E.D.La.1978) in which it found, among other things, that the failure of one or more of the LP rotor blades caused the river casualty; that all of the repairers had been negligent and had breached implied warranties of workmanlike repair, and were consequently liable for damages arising from the river casualty; that no repairer was responsible for the excessive tip clearances that caused the Cork casualty; that Todd was entitled to indemnity from Turbine Service and Gonzales; and that no exclusion of the insurance policies of Travelers and Sentry relieved them from liability for the damages caused by their insureds. The court ordered Todd to pay Owners $967,633.20, plus costs, attorneys' fees and post judgment interest (subject to Todd's right of indemnity, except for attorneys' fees, against Turbine Service/Travelers and Gonzales/Sentry.

The crucial issues before the district court in this case were: what caused the river trial damage, and who is responsible for this casualty. There was substantial evidence to support the district courts' finding that it was negligent to weld new airfoils

on old roots of the LP rotor and that the failure of the welds in the rotor blades caused the casualty. The clearly erroneous rule disposes of this issue on appeal.

The villian, to whom the finger of responsibility is pointed, is Sheridan, supervisor of the LP turbine repairs for Turbine Service. The district court found that he was negligent in three independent respects. First, in conceiving and directing the plan to weld new airfoils to old blade roots of the turbine—a method universally condemned by the experts who testified at trial. Second, in failing to consult with a welding engineer to determine a proper welding procedure; and third, in failing to conduct any testing on the fabricated blades (beyond beating them with a hammer) to determine whether or not they would stand up in service. It appears that Sheridan misled both Todd and Gonzales during the course of the repairs by telling them that he had located replacement blades when he had not, and telling Gonzales that the welding procedure had received Owners' approval when it had not. The district court found Sheridan's testimony on numerous occasions unworthy of belief—a finding fully supported by the record.

■ Travelers, arguing for Turbine Service, claims clear error in the district courts' failure to exonerate Turbine Service from performance of its contract and from liability due to the parties mutual mistake of fact as to the pre-repair condition of the turbine. The district court found that in February 1975, no party to the lawsuit was aware of the distortion in the casings of the LP turbine—a finding that cannot be said to be clearly erroneous.

Travelers, in effect, concedes that Turbine Service was negligent in its repair of the LP turbine. However, Travelers points out that contracts may be rescinded if entered into by the parties under a mutual mistake of facts regarding the condition or quality of the object of the contract. Travelers argues that its contract for repair of the LP turbine was entered into under a mutual misapprehension of the turbine's actual condition; that unknown to all parties, the casings of the LP turbine were so distorted at the time the repair work was undertaken that a complete overhaul of the LP turbine was necessary. According to Travelers, this condition made it impossible for Turbine Service to perform its repairs in a workmanlike manner, because the work would not have repaired what was actually wrong with the turbine. Travelers argues that even if Turbine Service had performed its obligations to perfection, its work would have been worthless to Owners, as it would have been necessary to rip it out to accomplish the reboring and remachining of the casings. We are not moved by this argument.

The object of Turbine Service's contract with Todd was the reblading, not the correction of the distortion of the casing (not known about at the time) of the LP turbine. It was entirely possible to reblade the turbine in a workmanlike manner. Whether the reblading would have rendered the KATRIN operative in the light of the distorted casing is a different question, but is wholly irrelevant to the contract between Turbine Service and Todd. If Travelers reasoning were sufficient to invalidate the contract and exonerate Turbine Service from liability, it would also suffice to remove Todd's obligation to pay Turbine Service had the latter performed its repairs in a workmanlike manner—a patently absurd result.

Travelers next insists that the district court committed clear error in failing to find that Owners were contributorily negligent with respect to the river trial casualty. The court found that Owners' representative did not know prior to the river trial casualty that new airfoils had been welded to the old turbine blade roots. It further found as a matter of law that Owners were not under a duty to inspect the repaired blades in the LP turbine to insure themselves that the blades were not welded or otherwise defective.

Travelers claim that Owners' representatives were negligent in failing to look for or discover the "idiosyncratic design changes" that caused the river casualty; in not re-

specting the recommendation of their own expert that all rotor blades be replaced; and in failing to order the cessation of all work when the casing distortion was discovered during the turbine's reinstallation. We disagree.

█ While there may be some evidentiary conflict concerning what the Owners' representatives knew about the faulty repair, when Sheridan's testimony is given no weight as unworthy of belief, it cannot be said that the district courts' finding that the Owners were not contributorily negligent is clearly erroneous. The record supports the finding that at the time of the river trial the Owners' representatives were led to believe by all of the defendants that the repair had been made in a workmanlike manner, and no one even suggested, at the time, that the distortion of the casing, which made it difficult to close, would affect the clearances. The district courts' finding that the distorted casing did not contribute to or cause the damage to the LP turbine is not clearly erroneous.

█ Gonzales argues that although it had to perform its welding and machinery work in a non-negligent and workmanlike manner, the district court placed an unfair burden on it by requiring it to be an expert in the field in which it worked since Turbine Service initiated the welding and fabrication procedure, directed the methods of fabrication, would not permit any variation, and undertook to perform all testing. Gonzales simply did what it was told to do. Thus it was clear error to hold Gonzales responsible for the weld failure.

We agree with the district courts' observation that "[a] repairer must have more responsibility than merely following orders. . . . This is particularly true when the customer ordering the work is not a welding expert." Gonzales knew that its product was going into a turbine that would turn up to 6,500 r.p.m.'s; knew that there was a likelihood that the welds would not hold up under the type of pressure to which they would be subjected; used fillet welds and fusion patches instead of a full penetration weld; did not even know or attempt to determine what the metals were before the welding; found out only after the fact that it did not use the correct welding rod and that the welding of the metals involved could only be properly conducted with preheat, post-heat and stress-relieving treatment; and finally was so doubtful about welding new airfoils to old roots on a steam turbine rotor and so doubtful about the type of weld used that it sought and obtained a release from liability from Turbine Service. As the district court aptly put it "[t]he original negligence of Gonzales in defectively welding the blades was like a time bomb aimed at the KATRIN."

Todd, while happy that the district court upheld the validity of its red letter clause limiting its liability to $300,000.00,[2] is unhappy because the district court at the same time took away the limitation by holding that Todd was guilty of gross negligence. By the same token the "sole causation" language in the red letter clause was automatically invalidated.[3] Todd claims clear error in these rulings.

At the time of the repairs Todd had the capability to reblade the turbine, but not the capacity to manufacture the blades. Todd's labor force was fully occupied, its shops were crowded, and it lacked extra

---

**2.** The red letter clause in Todd's repair contract provided in pertinent part: "We contract for vessel repair and drydocking and other services only upon the basis of insured limited liabilities as set forth below. In no event shall our liability for any claim arising under this contract exceed in the aggregate the sum of $300,000," . . . .

**3.** In this respect the red letter clause provided: "We are not liable for defective workmanship or material or for damage to any vessel or for any loss sustained by its Owners, charterers or underwriters, or parties in interest, directly or indirectly, in contract, tort or otherwise, unless the same is caused solely by the negligence of one of our employees, which negligence shall not be presumed but must be affirmatively established. Our liability, if any, is strictly limited to the cost of repair, correction or replacement therefor and in no event shall we be liable for any consequential damage whatsoever, including, but without limitation, delay, detention, demurrage, towage and pilotage."

personnel needed to repair the turbine. It never contemplated performing the turbine repair with its yard personnel.

Todd asked Turbine Service to investigate possible methods of repairing the LP turbine. Todd had contracted with Turbine Service on previous jobs for, among other things, opening and closing of a main turbine, reblading turbine generators, major rotor work, and smaller turbine work. However, Todd conducted no independent investigation of the qualifications of Turbine Service to perform a major steam turbine reblading job.

Informal discussions between Todd and Turbine Service resulted in an understanding that Turbine Service was to accomplish the repair work on the LP turbine and that it would locate replacement blades to make the permanent repairs. Todd issued purchase orders to Turbine Service for repairing the HP turbine rotor and the LP turbine. The orders stated that the work could not be subcontracted. Turbine Service nevertheless subcontracted part of its work to Gonzales, without Todd's knowledge or permission. The work done by Gonzales under the supervision and control of Turbine Service was improper, and was the cause of the river trial casualty. When the LP turbine was returned to Todd none of its personnel knew that new airfoils had been welded to old roots on the LP rotor.

The district court found as a matter of law that:

> The standard of conduct which applies to a shipyard conducting a major repair job as the main propulsion unit of a large vessel requires at least two things that Todd did not do. A shipyard must: (1) find out at least the broad outlines of the steps planned by a subcontractor and (2) inspect the finished repairs closely enough to be able to determine whether or not sub-standard repairs have been made or idiosyncratic design changes have been employed.

467 F.Supp. at 1286–87.

Todd insists that it was not negligent. It simply contracted with Turbine Service to furnish and install new replacement blades

in the rotor. It was under no duty, it is argued, to inspect or supervise the ordinary operational details of the subcontracted work, or to examine the assembled rotor upon its return for concealed defects.

Todd asserts that the damages suffered by Owners arose from the negligence of the independent contractor, Turbine Service, who deceived Todd by assuring it that it had located replacement blades when in fact it had not and had surreptitiously resorted to welding new airfoils on old roots. Todd argues that its sole possible fault was its failure to discover the concealed negligence of Turbine Service.

It is true that "... a contractor, who has employed a competent subcontractor, is not liable for his faults," *Person v. Cauldwell-Wingate Co.*, 176 F.2d 237, 239–40, (2nd Cir. 1949), *cert. denied*, 338 U.S. 886, 70 S.Ct. 189, 94 L.Ed. 544 (1949), but the evidence here bears out forcefully the incompetency of Turbine Service to do the repair work on the LP rotor.

Without iterating the underlying facts it suffices to say that the standard of care enunciated by the district court was proper in this case and its findings that Todd was negligent and that such negligence was the proximate cause of the Owners damages is not clearly erroneous.

The district court upheld the validity of Todd's red letter clause which limited is liability for negligence or breach of contract to $300,000.00, but it also held that it was ineffective because Todd was guilty of gross negligence.

[7] We have no difficulty in affirming the district courts' finding that, under the circumstances of this case, the red letter clause is valid. *Alcoa Steamship Co., Inc. v. Charles Ferran & Co., Inc., et al.*, 383 F.2d 46 (5th Cir. 1967), *cert. denied*, 393 U.S. 836, 89 S.Ct. 111, 21 L.Ed.2d 107. The court found, and we agree, that the parties to the repair contract enjoyed approximately equal bargaining power and that the red letter clause applied to all orders or work placed with Todd.

A more difficult question to be resolved is the finding by the district court that Todd is guilty of gross negligence which vitiates the red letter clause. The court held, as a matter of public policy, that the clause is invalid because Todd undertook "to conduct substantial repair work to a component of a vessel that is vital to the vessel's safety, and . . . [its] conduct was greatly below the standard established by law to protect others against unreasonable harm." Restatement Of Contracts § 574 (1932). The premise for this finding was that Todd effectively ignored a vessel repair it had contracted to perform.

Owners submit that they were unaware that Todd was unable to make the repairs, and that it would turn the work over to an incompetent subcontractor who had never been investigated by Todd. They urge that Todd not only abdicated its responsibility in subcontracting the work, but equally as bad, did not supervise the repair, or sufficiently inspect the work done by Turbine Service to determine whether it had been performed in a proper manner before it was reinstalled in the turbine. All of this, they argue, adds up to gross negligence.

Todd responds that it had previously subcontracted considerable work to Turbine Service which had been performed in a competent manner. Todd did not, and could not know, that Turbine Service lied about its ability to locate replacement blades, and concealed the fact that it had resorted to welding new airfoils on old roots. It submits that the evidence totally failed to establish that a reasonable inspection could have disclosed that the blades were welded.

■ Gross negligence, which will invalidate an exemption from liability has been defined as ". . . harm wilfully inflicted or caused by gross or wanton negligence." 6A Corbin On Contracts § 1472 (1964 ed.) The type of negligence, "ordinary" or "gross", depends on the particular circumstances of each case. A careful review of the record leads us to the firm conclusion that Todd was not guilty of inflicting an intentional tort, or that the Owners' damages were caused by a wanton disregard of Todd's responsibility under the contract or the duty owed by it to the Owners. Thus the district courts' conclusion that Todd was guilty of gross negligence is erroneous.

Finally Todd contends that the district court erred in failing to find that the "sole negligence" exemption in the red letter clause[4] was applicable since the casualty was found to have been caused by the joint and several fault of Gonzales, Turbine Service, and Todd. While Todd did not disclaim all liability, it argues that it did restrict its liability to the sole negligence of its own employees which it could prevent.

■ We are not called upon to consider the efficacy of this clause in instances when the work is performed by Todd and its employees. But under the circumstances of this case, to suggest that the clause is applicable because the work was subcontracted by Todd and resulted in a finding of joint and several liability, thus releasing Todd of liability under the "sole causation" of its red letter clause is so repugnant to common sense and public policy that it cannot stand. Such an interpretation would lead to the preposterous result that a contractor could relieve itself of all liability by subcontracting the work to a wholly incompetent subcontractor.[5]

Todd apparently had little confidence that the sole negligence clause would act as a liability buffer when it subcontracted work since it covered itself by providing for a full indemnity from its subcontractor Turbine Service, an unneeded protection if the exemption was applicable. Understandably, Todd has not favored us with any authority to support its position.

Having determined the liability issues as to the defendants, we now turn to the question of damages. All of the defendants

---

**4.** See note 3, *supra*.

**5.** " 'If the law supposes that,' said Mr. Bumble. . . 'the law is a ass, a idiot.' C. Dickens, *Oliver Twist*, ch. 51 (1838)" *Debra P. v. Turlington*, 654 F.2d 1079 at 1088 n.3 (5th Cir. 1981.) (Hill, J., dissenting).

unite in attacking the district court's basis for assessing damages; its determination of the amount of damages to be awarded Owners for repairs and expenses; the amount of damages to be awarded for loss of use of the KATRIN; and in failing to limit Owners' recovery to the value of the KATRIN in her damaged, February 1975, condition.

The principal argument of the "united" defendants is that it was error for the district court to apply a contractual rather than a tort measure of damages. The district court determined that the injured party should be returned to the position it would have occupied had the contract not been violated. Accordingly, the court awarded Owners the sum of the cost of repairs to return the LP turbine to the state it would have been in had the contract been performed, the necessary expenses during the down time of the vessel, the loss of profits during the down time, (the down time being the amount of time it would have taken Todd to complete the repairs necessary to restore the LP turbine), and the costs and attorneys' fees.

The defendants urge that under the proper tort measure of damages Owners should have been placed as nearly as possible in the condition they occupied before the wrong complained of occurred. Thus the district court should have determined the condition of the LP turbine immediately before the KATRIN's arrival at Todd, since that is the condition to which Owner would be entitled to be restored. Defendants point out that when the KATRIN arrived at Todd, the condition of the LP turbine was so poor that it required complete reblading, and that after the river trial casualty the condition of the turbine was the same—complete reblading was required. Thus, defendants conclude, the river trial casualty did not cause any actual damage to the Owner. We disagree.

 The district court correctly found that a shipowner has a maritime cause of action whether he sues in contract for its breach by a person with whom there was a contract for repairs of the vessel, or

in tort for the negligent performance of the maritime contract. *Alcoa Steamship Company, Inc. v. Charles Ferran & Co., Inc., supra.* The court also correctly found that tort measure of damages is applied in classic cases when two parties unknown to each other come into contact and one comes away damaged, such as collision cases and other maritime torts. Understandably, none of the cases defendants rely on to support their argument involve a breach of contract. But Todd breached its contract to repair the LP turbine and this fact permits the adoption of a different measure of damages. It is too well settled to require citation of authorities that damages awarded for breach of contract should return the party to the position he would have occupied had the contract not been violated. Owners are entitled to have the LP turbine in the condition contracted for, and to recover as well for loss of use of the vessel, out-of-pocket expenses, and (since defendants breached warranties of workmanlike performance) costs and attorneys' fees.

The defendants take the position that some expenses are attributable to their defective repairs and these should be for their account, but they were charged with numerous items of expense not attributable to the defective repairs, and other items of expense should have been at least prorated. They point out, for example, that the total expenses directly related to sending the KATRIN's LP turbine to Siemens for repair was $412,272.00, of which amount the district court found $221,394.00 was attributable to the repairs. This included $61,000.00 to manufacture the blades and $160,394.00 for that part of the Siemens repair work allocated as damages caused by defendants' negligence. The defendants contend that this is clear error because all of the work which was done by Siemens after the river trial was required by the distortion of the LP casing. Moreover, they argue the only identifiable damage to the turbine parts caused by their defective repairs was the damage to the rotor necessitating the manufacturing of a new set of blades at a cost of $29,069.77.

The trouble with this argument is that the district court found, and correctly so, that the extent of the river trial damages and defective repairs was properly determined by the Joint Survey, in which all repairers participated on Todd's list of damages. And while the court found that the casing distortion was pre-existing, it opted to accept the Owners' expert's opinion that this was not a proximate cause of the damage to the LP turbine. We cannot say that this was clearly erroneous.

Defendants then argue that the $61,000.00 award for replacement blades as quoted by Siemens was overly generous because of the number of blades involved and the evidence they submitted that Leesona Corporation made a bid, rejected by the Owners, at an average cost of $47 per blade or a total of $37,000.00.

The only evidence that the Owners rejected such a bid is the testimony of Sheridan of Turbine Service, who the district court found unworthy of belief, a finding that is fully supported by the record. As the district court pointed out Leesona did not clearly specify what blade sizes were used to make their quotation. The courts' findings with respect to these damaged items can hardly be said to be clearly erroneous.

In addition, the district court found that the amount of Owner's out-of-pocket expenses attributable to defendants' negligence was $276,052.00. This amount was the sum of numerous miscellaneous and often minute expenses. It included the full cost of shipping the turbine to Germany and of reinstalling it in the KATRIN, notwithstanding the fact that Siemens undertook significant repairs not necessitated by defendants' negligence. The total award for repairs and expenses was $497,446.00. The defendants ask us to reduce numerous items of damage as found by the district court by percentages varying from 10 to 100% and to find that Siemens' expenses, the KATRIN's agency accounts, surveyors accounts, master accounts, repatriation and crew expenses, and bunker and lube oil

should amount to no more than $120,994.00 even under a completed contract theory. They argue that it was clear error for the district court to charge them with all of the shipping and reinstallation costs associated with the LP turbine since the costs were partially attributable to repairs not necessitated by defendants' negligence. Further, the defendants assert that the award of reinstallation expenses of approximately $100,000.00 was error when Owners had received a firm quotation from Todd of only $29,000.00 for reinstallation. They argue that the necessary repairs could have been accomplished in the United States rather than in Germany, and that the turbine's reinstallation could have been accomplished by New Orleans rather than New York laborers. We are unpersuaded.

It would serve no useful purpose to discuss each of the defendants specific allegations of error in the courts findings as to damages.[6] There was, of course, conflicting evidence concerning the work required to be done, the work that was actually accomplished and the reasonable cost of the work. The district courts' function was to weigh the evidence, make credibility choices and find the facts. We are convinced that no mistake was made. "In an admiralty action, the trial courts' findings of damages are matters of fact and should be affirmed if not clearly erroneous." *Florida East Coast Railway Company v. Revilo Corp., supra* at 1067. The record fully supports the courts' finding that defendants' negligence necessitated the LP turbine repairs, and since the most competent repairer available was the German manufacturer, it was reasonable to ship the turbine to Germany. The mere fact that Owners had additional work done on the turbine between its removal from the KATRIN and the reinstallation does not mean the defendants should be relieved of the shipping and reinstallation costs. Moreover, we look with a jaundice eye on Todd's offer to reinstall the LP turbine for $29,000.00. It was conditioned on paying or

---

6. We consider de minimus defendants disputes of items such as a $10.00 telephone service charge on the ground that there is no evidence this charge resulted from the river casualty.

providing Todd with a $300,000.00 security deposit. The manner in which Todd had handled the turbine repairs hardly inspired confidence, and at that precise time the parties were already engaged in litigation. The other New Orleans repairers refused to bid on the reinstallation because they wished to stay clear of the disputes between Todd and Owners.

Next the defendants take issue with the amount of damages awarded Owners for the loss of use of the KATRIN. The district court first determined the amount of down time caused by defendants' negligence. The court decided it would have taken 215 days after the river casualty to put the KATRIN in the condition Owners had bargained for—the sum of (a) the number of days (58) between May 25, 1975, when defendants should have completed their repairs, and July 21, 1975, when Owners acquired sufficient information to permit them to determine what new repairs were needed; (b) the number of days (122) needed to manufacture the replacement blades; and (c) the number of days (35) needed to reinstall the blades and put the vessel back into service.

The district court next determined what the loss of use cost Owners per day. To do this the court examined the record of the KATRIN on past voyages. The court found that the vessel's average net profit was $1,400.00 per day during 1973, 1974, $2,000.00 per day during 1974 alone, and $4,000.00 per day during the last half of 1974. The court concluded that a reasonable net profit figure was $3,000.00 per day. Multiplying $3,000.00 by 215 days, the court awarded $645,000.00 as recoverable damages for loss of use.

■ Defendants contend that the district courts' award of damages for loss of use was based on two clearly erroneous factual findings: that the amount of down

time attributable to defendants negligence was 215 days, and that the loss of use cost the Owners $3,000.00 per day. The defendants submit that the KATRIN would have been out of commission for at least this number of days without defendants' negligence, since the vessel's turbines required complete reblading before as well as after the negligence occurred. Defendants suggest that the number of days of down time attributable to defendants' negligence was the number of days needed to make all necessary repairs to the KATRIN, minus the number of days needed to make the repairs caused by defendants' negligence. They argue that this difference is between 30 and 60 days. We are not persuaded by this argument. The proper test, as applied by the district court, is the amount of time it would reasonably take, after the river casualty, to put the KATRIN in the condition for which Owners had bargained.

Defendants next argue that in the 720 days preceding the vessel's arrival in New Orleans, she was operational only 381 days of the time, or 52 per cent, thus the district court should have found that the KATRIN would have been productive during only 122 days of the 215 days of down time. The record, however, clearly discloses that the vessel was operational 77.2% of the time.[7]

■ The district court in calculating the loss of use time of 215 days, did not then apply the percentage of productive time of 77.2% which results in a loss of use time of 166 days rather than 215 days. This was clear error.

■ Defendants take strong issue with the courts finding of a loss of net profit to the Owners of $3,000.00 per day. They contend that the finding failed to reflect the rapid decline of the market in 1975, the KATRIN's deteriorating condition, and her need for extensive repairs which drastically

7. The premise for defendants argument that the vessel was operational only 381 out of 720 days is Travelers' Exhibit 2. But this Exhibit is inaccurate because it does not show the time the vessel was employed in 1973. By reference to the KATRIN's engine and deck logs and Plaintiffs' Exhibit 2, the KATRIN was incapaci- tated at anchor, under tow or in a yard for 141 days. During the same period of time the KATRIN lost 23 days between charters which, when added to the 141 days for break down and repairs, gives 164 days nonoperating time out of 720 or a 77.2% operating average.

lowered her earning average. But the district court did consider the contention of the defendants that the "golden era" in the shipping industry came to an end in 1975. It found, nevertheless, that the market picked up again in 1976. The court was also abundantly aware of the condition of the KATRIN. On the record before us, we cannot say that the district court's finding of a net profit loss per day of $3,000.00 is clearly erroneous.

The loss of use damage then is to be calculated at $3,000.00 per day for 166 days or $498,000.00. The district court will be directed to modify its judgment accordingly.

■ The defendants next insist that since the cost of repairing the damages caused by the defendants exceeded the market value of the vessel in her condition prior to the casualty, the vessel was a constructive total loss and recoverable damages are limited to the value of the vessel in her damaged condition. They argue in the alternative that the total repairs, including the complete rebuilding of the LP turbine in 1975, exceeded the Owners' estimate of the value of the KATRIN in sound condition, or that at a minimum, the vessel's sound value in February, 1975, was $805,000.00, and since the required repairs were at least $673,957, this should have resulted in a damage award to Owners of no more than $167,043.00.

Both Owners and defendants are somewhat cavalier about the facts, particularly with regard to the KATRIN's February 1975 market value. Further discussion of the defendants' constructive total loss argument, would serve no useful purpose however, because it ignores the fact that the district court properly applied a contractual rather than a tort measure of damages.

■ Finally, the defendants attack the district court's award of attorneys' fees to the Owners. Pointing to the "American Rule" they observe that the prevailing party is ordinarily not entitled to collect attorneys' fees from the losing party. They argue that the district court erred in ignoring the American Rule since the only exception to the rule is when bad faith or oppressive litigation tactics are shown, and they are absent here. *Alyeska Pipeline Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). But the defendants overlook the rule that "[i]n this circuit foreseeable damages recoverable for breach of warranty of workmanlike performance include reasonable attorneys' fees and litigation expenses. *Strachan Shipping Co. v. Koninklyke Nederlandsche*, 5th Cir. 1963, 324 F.2d 746." *McCawley v. Ozeanosun Compania, Maritime, S.A.*, 505 F.2d 26, 32 (5th Cir. 1974); *Accord, Thibodeaux v. Texas Eastern Transmission Corp.*, 548 F.2d 581, 587 (5th Cir. 1977).

To complete our consideration of the damage issues we take up the Owners contention that the district court erred in failing to award them pre-judgment interest because there are no peculiar circumstances justifying denial of such interest. While the court awarded post-judgment interest it made no mention of pre-judgment interest in either its judgment or its findings of fact and conclusions of law.

■ The award of pre-judgment interest is the rule rather than the exception. *Complaint of M/V Vulcan*, 553 F.2d 489 (5th Cir. 1977). As we said *Noritake Co. v. M/V Hellenic Champion, supra*, at pp. 728–730:

> As a general rule, pre-judgment interest should be awarded in admiralty cases—not as a penalty but as compensation for the use of funds to which the claimant is rightfully entitled. Discretion to deny pre-judgment interest is created only when there are 'peculiar circumstances' that would make it inequitable for the losing party to be forced to pay pre-judgment interest.
>
> \* \* \* \* \* \*
>
> If the trial court does not make any mention of pre-judgment interest in its judgment or its findings of fact and conclusions of law, then it is more difficult to infer that the trial court has found peculiar circumstances and decided to exercise the discretion that those circumstances

create. * * * [W]hen no peculiar circumstances are disclosed on the face of record, and the case is of a type in which peculiar circumstances are less likely to exist, we have reversed the judgment of the district court insofar as it fails to award pre-judgment interest.

■ No peculiar circumstances are apparent from the record which would permit the exercise of discretion not to award pre-judgment interest. On remand, the district court will be directed to calculate and award pre-judgment interest. ·See *International Paint Co., Inc. v. M/V Mission Viking*, 637 F.2d 382, 386 (5th Cir. 1981).

We next consider the questions of indemnity which are under attack by all parties. Turbine Service insists that the district court erred in granting Todd indemnity against Turbine Service. It draws our attention to the fact that the court based its award on the breach of an implied warranty of diligence and workmanlike performance and did not address itself to the express indemnity language in Todd's Purchase Order,[8] as it was required to do. *Continental Casualty Co. v. Canadian Universal Ins. Co.*, 605 F.2d 1340 (5th Cir. 1979) *cert. den.*, 445 U.S. 929, 100 S.Ct. 1317, 63 L.Ed.2d 762; *Evans v. Triple R. Welding & Oil Field Maintenance Corp.*, 472 F.2d 713 (5th Cir. 1973). Turbine Service argues that since the indemnity provision contains no reference to indemnity for Todd's own negligence, Todd is precluded from receiving indemnity from Turbine Service because clauses purporting to indemnify one against his own negligence are to be strictly construed and must clearly state that intention. *M.O.N.T. Boat Rental v. Union Oil,*

*Etc.*, 613 F.2d 576 (5th Cir. 1980); *Cole v. Chevron Chemical Co-Oronite Division*, 477 F.2d 361 (5th Cir. 1973).

The short answer to this argument is that the "Indemnification and insurance" clause in the Purchase Order does not speak to the indemnification of Todd by Turbine Service arising out of the unworkmanlike performance of Turbine Service under the contract, but is obviously intended only to require insurance to indemnify Todd for damage caused to its property or employees during a bailment of Todd's property. This is perfectly clear by a mere reading of the clause. But if there should be any doubt about it, it is put to rest by reference to the remaining language of the Purchase Order which provided that all goods and labor were to be warranted by Turbine Service to be merchantable and fitting in all respects for the purpose for which intended; and that Turbine Service's guarantee of all material, equipment, and labor would be co-extensive with Todd's guarantee to its customers.

■ The district court properly relied upon breach of the implied warranty of diligent and workmanlike performance of Turbine Service to award Todd indemnification from Turbine Service. *See Parfait v. Jahncke Service, Inc.*, 484 F.2d 296, 302 (5th Cir. 1973); *Garner v. Cities Service Tankers Corp.*, 456 F.2d 476, 481 (5th Cir. 1972); *Waterman Steamship Corporation v. David*, 353 F.2d 660, 665 (5th Cir. 1965), *cert. den.*, 384 U.S. 972, 86 S.Ct. 1863, 16 L.Ed.2d 683 (1966). Todd's negligence vis-a-vis the Owner does not bar its right to indemnity from Turbine Service. *Southern Stevedor-*

---

8. Todd's Purchase Order provides in part: "INDEMNIFICATION AND INSURANCE—Seller shall be liable for the loss of or damage to Buyer's or Buyer-furnished or Government-furnished property while such property is in Seller's possession. Seller agrees to carry fire and extended insurance coverage on all such property and to indemnify and save Buyer harmless from any and all judgments, orders, awards, costs, and expenses, including attorneys' fees and also claims on account of damage to property or bodily injury (including death) which may be sustained by Seller, Seller's employees, Buyer, Buyer's employees or third persons,

arising out of or in connection with work performed for Buyer on premises occupied or under control of Buyer or Seller."

The Purchase Order also provided that all goods and labor were to be warranted by Turbine Service to be merchantable and fitting in all respects for the purpose for which intended; that Turbine Service would guarantee to Todd all the material, equipment and labor in the same manner and to the same extent that Todd was required to guarantee such material, equipment and labor to its customers and additionally forbid any subcontracting of the work by Turbine Service.

*ing & Contract Co. v. Hellanic Lines, Ltd.,* 388 F.2d 267 (5th Cir. 1968). We find inapposite the line of cases exemplified by *Nelson v. Jacksonville Shipyards,* 440 F.2d 668 (5th Cir. 1971) relied upon by Turbine Service, suggesting that recovery should be denied to an *actively* independent contractor seeking indemnity from another independent contractor.

Turbine Service asserts that the district court erred in failing to find that Turbine Service was entitled to indemnity from Gonzales. Sheridan of Turbine Service executed and delivered a release to Gonzales after the faulty welding had been accomplished and the return of the turbine parts to Turbine Service.[9] The district court held that the release barred Turbine Service from relying upon implied contractual indemnity. Moreover, recovery could not be predicated upon the principles of active and passive negligence, nor on any other non-contractual indemnity theory. We agree.

Sheridan was the main participant for Turbine Service throughout the entire repair work. Gonzales followed his directions in welding the new airfoils to the old roots of the LP rotor, although Gonzales was doubtful that the welds would hold up satisfactorily. Sheridan was held out as having full authority to contract with Gonzales and to do whatever was necessary to accomplish the work Gonzales was asked to do. Under the circumstances, Gonzales had the right to rely on Sheridan's authority to execute the release.

There was adequate consideration for the release because Gonzales told Sheridan at the outset of the work that it did not know whether the work to be done by it was proper, but since it was being done under Sheridan's instruction, Gonzales wanted a release when it had completed the work. Sheridan agreed. Turbine Service is not entitled to indemnity from Gonzales.

Gonzales challenges the district courts' finding that Todd was entitled to indemnity from it. Gonzales' arguments for the most part, parallel those of Turbine Service. We will not extend this opinion by tracking through them again. Additionally, Gonzales contends that since there was no contract between Todd and Gonzales, there can be no warranty of workmanlike performance owed to Todd, and thus no indemnity in favor of Todd. We disagree. Privity of contract is not essential. Implied warranties of workmanlike performance may extend to parties who are not in direct contractual relationship. *Whisenant v. Brewster-Bartle Offshore Company,* 446 F.2d 394, 401 (5th Cir. 1971). We uphold the finding of the district court that Todd is entitled to indemnity from Gonzales.

Todd complains that the district court should have awarded but failed to award it attorneys' fees as a part of the indemnity award to it by Turbine Service and Gonzales. The district court properly declined to do so. Todd's reliance upon *Olsen v. Shell Oil Co.,* 595 F.2d 1099 (5th Cir. 1979) is misplaced. In that case the parties provided by contract that each should hold the other harmless in any suit by the employee of the other which arose out of the work to be performed under the contract. The court held that the contract to hold harmless necessarily included payment of attorneys' fees. Here, Todd's indemnity award was, for the most part, based upon evidence not produced by Todd but by Owners' attorneys' perseverance. Moreover Todd not only defended against liability, but teamed up with Turbine Service and Gonzales to attack almost every item of damage sought to be proven by Owners. We agree with the district court that the breach of the implied warranty of workmanlike performance on the part of Turbine Service and Gonzales resulting in indemnity to Todd does not in the circumstances of this case require the award of attorneys' fees to Todd.

We turn our attention to the insurance coverage of the Travelers and Sentry poli-

---

**9.** The release stated "Gonzales Manufacturing and Industrial Machine Works, Inc. makes no warranty as to the suitability of such repairs and accepts no liability for any possible failure in service or consequential damage arising from such failure.

cies. Both Turbine Service and Gonzales had in effect comprehensive general liability insurance policies issued by the respective insurance companies.[10]

These policies provide:

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of . . . property damage to which this insurance applies, caused by an occurrence . . . .

The policies define "occurrence" as "an accident . . . which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured." The policies define "property damage" as (1) physical injury to or destruction of tangible property which occurs during the policy period, including the loss of use thereof at any time resulting therefrom, or (2) loss of use of tangible property which has not been physically injured or destroyed provided such loss of use is caused by an occurrence during the policy period . . . .

Travelers and Sentry argue that the district court erred in failing to find that various exclusions contained in their policies relieve them from liability in this case. We discuss each of these exclusions in turn.[11]

■ First, the insurance policies exclude coverage for "property damage to . . . property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control." The insurers argue that this provision relieves them from liability for certain repairs and expenses. This argument is unavailing, since under Louisiana law [12] the exclusion does not apply where, as here, the occurrence causing damage occurs after the insured relinquishes custody or control of the property. *Eymard v. C & W Well Servicing, Inc.*, 258 So.2d 406, 408 (La.App.), *writ refused*, 261 La. 465, 259 So.2d 915 (1972).

■ The policies next exclude coverage for

loss of use of tangible property which has not been physically injured or destroyed resulting from . . . the failure of the named insured's products or work performed by or on behalf of the named insured to meet the level of performance, quality, fitness or durability warranted or represented by the named insured . . . .

Travelers and Sentry argue that this provision relieves them of liability for loss of use of the KATRIN. This argument too is unavailing, for the simple reason that the KATRIN did sustain physical injury to its LP turbine as a result of the failure of the insured's work product to meet the level of performance impliedly warranted by the insureds. Alternatively, if the KATRIN herself could not fairly be considered the property injured during the river trial casualty, this case would fall within the policy's exception to the exclusion:

[T]his exclusion does not apply to loss of use of other tangible property resulting from the sudden and accidental physical injury to or destruction of the named

---

**10.** The provisions of the Travelers and Sentry policies at issue in this case are identical in all material respects. Both policies contain contractual liability endorsements as well as comprehensive general liability provisions. In light of our findings regarding the applicability of the general liability provisions, we need not consider the applicability of the contractual liability endorsements.

**11.** Although the exclusions in the Travelers and Sentry policies are substantively identical, they are identified by different letters. Thus, Travelers' exclusion (1) is identical to Sentry's exclusion (n), Travelers' exclusion (m) is identical to Sentry's exclusion (o), and so on. We shall refer to the exclusions as they are denominated in the Sentry policy.

**12.** Under Louisiana conflict of law rules the interpretation of insurance contracts is governed by the laws of the state where the contract was entered into. *Deane v. McGee*, 261 La. 686, 260 So.2d 669, 673 (La.1972); *Wickham v. Prudential Insurance Company of America*, 366 So.2d 951, 954 (La.App.1978). Although the record on this point is not completely clear, it appears the insurance contracts here at issue were entered into in Louisiana. Indeed, the parties have argued before this court on the basis that Louisiana law applies. We therefore apply Louisiana law in construing the Travelers and Sentry policies.

insured's products or work performed by or on behalf of the named insured after such products or work have been put to use by any person or organization other than an insured . . . .

The work performed by Turbine Service and Gonzales sustained sudden and accidental injury during the river trial casualty, and the KATRIN under this alternative view is "other tangible property" whose use was lost as a result of this injury. We conclude, then, that this exclusion does not relieve the insurers of liability.

■ Exclusion (p) of the insurance policies excludes coverage for

damages claimed for the withdrawal, inspection, repair, replacement, or loss of use of the named insured's products or of any property of which such products or work form a part, if such products, work or property are withdrawn from the market or from use because of any known or suspected defect or deficiency therein.

Travelers and Sentry argue that the damages claimed by the KATRIN's Owners fall within this exclusion. This argument ignores, however, the exclusion's origin and purpose.

Exclusion (p) is known as the "sistership" exclusion, a term derived from an occurrence in the aircraft industry in which one plane crashed and its "sisterships" were thereafter grounded and recalled by the manufacturer in order to correct the common defect that had caused the crash. *Arcos Corp. v. American Mutual Liability Ins. Co.*, 350 F.Supp. 380, 384 n.2 (E.D.Pa.1972), *affirmed*, 485 F.2d 678 (3rd Cir. 1973). The provision is intended to exclude from coverage the cost of preventative or curative action by withdrawal of a product in situations in which a danger is to be apprehended. *Wyoming Sawmills, Inc. v. Transportation Insurance Co.*, 282 Or. 401, 578 P.2d 1253, 1257 (1978); *Yakima Cement Products Co. v. Great American Insurance*

*Co.*, 22 Wash.App. 536, 590 P.2d 371, 374–75 (1979). It is not, however, intended to exclude from coverage damages caused by the very product whose failure to perform properly aroused apprehension about the quality of "sister" products. 2 R. Long, *The Law of Liability Insurance* § 11.11 (1981). Still less is it intended to exclude from coverage damages arising from the malfunctioning of a product where no "sister" products are involved. *See Elco Industries, Inc. v. Liberty Mutual Insurance Co.*, 90 Ill.App.3d 1106, 46 Ill.Dec. 319, 322, 414 N.E.2d 41, 45 (1980); *Yakima Cement Products Co. v. Great American Insurance Co.*, 590 P.2d at 374–76; *Ohio Casualty Insurance Co. v. Terrace Enterprises, Inc.*, 260 N.W.2d 450, 455 (Minn.1977); *Gulf Insurance Co. v. Parker Products, Inc.*, 498 S.W.2d 676, 678–79 (Tex. 1973); *Bigelow-Liptak Corp. v. Continental Insurance Co.*, 417 F.Supp. 1276, 1281–82 (E.D.Mich.1976); *Arcos Corp. v. American Mutual Liability Insurance Co.*, 350 F.Supp. at 385. It is clear, then, that exclusion (p) is not intended to exclude from coverage damages arising from the malfunctioning of the LP turbine.[13]

Exclusion (n) of the policies excludes coverage for "property damage to the named insured's products arising out of such products or any part of such products." The policies define "named insured's products" as "goods or products manufactured, sold, handled or distributed by the named insured." The insurers argue that Turbine Service and Gonzales "handled" the LP turbine, in the sense of physically handling it, and that the turbine is therefore their product.

An identical interpretation of "handled" was urged in *Smedley Co. v. Employers Mutual Liability Insurance Co.*, 143 Conn. 510, 123 A.2d 755 (1956). The court in that case stated:

It is true that the verb "handle" means to "touch; to feel with the hand; to hold, take up, move, or otherwise affect, with

---

**13.** As an independent ground for this conclusion, we note that most courts hold exclusion (p) inapplicable where the product is withdrawn by the insured rather than a third party. *See Elco Industries, Inc. v. Liberty Mutual Insurance Co.*, 46 Ill.Dec. at 322, 414 N.E.2d at 45 (citing cases). In this case neither Turbine Service nor Gonzales withdrew the KATRIN or its LP turbine from service.

the hand." * * * Webster also defines "handle" as "to buy and sell; to deal, or trade in." That the intention of the insurer was to restrict the word "handled" to this meaning is apparent from the words "manufactured, sold * * * or distributed," with which it is linked.

123 A.2d at 758. *Accord, Paxton-Mitchell Co. v. Royal Indemnity Co.*, 279 Or. 607, 569 P.2d 581, 587 (1977); G. Couch, *Cyclopedia of Insurance Law*, § 44A:56 (2nd Ed. 1981).

 Like the court in *Smedley*, we find that the verb "handled" as used in exclusion (n) means "to deal or trade in" rather than "to touch". Under this definition neither Turbine Service nor Gonzales handled the KATRIN's LP turbine. Since the insureds clearly did not manufacture, sell or distribute the LP turbine, the turbine is not the "named insured's product," and exclusion (n) is inapplicable.

 This conclusion may also be reached more directly by noting that engine repairs constitute a service rather than a product, and that under Louisiana law an exclusion relating to an insured's "products" does not exclude liability for losses arising from the insured's services. *Swillie v. General Motors Corp.*, 133 So.2d 813, 823 (La.App.1961); *see generally* Couch, *supra*, § 44A:60. Travelers and Sentry argue that the turbine may fairly be considered the repairers' product because the repairers replaced many of its parts. However, the mere fact that a repairer supplies or replaces needed parts in the course of making repairs does not render an exclusion relating to an insured's "products" applicable. *See Lieberman v. New Amsterdam Casualty Co.*, 284 A.D. 1051, 135 N.Y.S.2d 850 (1954), *appeal denied*, 285 A.D. 830, 137 N.Y.S.2d 840 (1955).

 Exclusion (o) of the insurance policies excludes coverage for

property damage to work performed by or on behalf of the named insured arising out of the work or any portion thereof, or

out of the materials, parts or equipment furnished in connection therewith ....

Turbine Service and Gonzales contend that this exclusion is inapplicable, relying on cases from numerous jurisdictions. We are bound, however, to apply the law of Louisiana, under which "injury to work" exclusions have consistently and unequivocally been held to eliminate coverage for the cost of repairing or replacing the insured's own defective work product. *Vitenas v. Centanni*, 381 So.2d 531, 535 (La.App.1980); *Breaux v. St. Paul Fire & Marine Insurance Co.*, 345 So.2d 204, 208 (La.App.1977); *Franks v. Guillotte*, 248 So.2d 626, 628 (La. App.1971); *Vobill Homes, Inc. v. Hartford Accident & Indemnity Co.*, 179 So.2d 496, 497–98 (La.App.1965), *writ refused*, 248 La. App. 698, 181 So.2d 398 (1966).[14]

Undaunted by these precedents, Turbine Service and Gonzales argue that the Louisiana courts would make an exception to their usual interpretation of exclusion (o) if confronted by the unusual facts of this case. Citing, *St. Paul Fire & Marine Insurance Co. v. Sears, Roebuck & Co.*, 603 F.2d 780, 784 (9th Cir. 1979) and *Pittsburgh Plate Glass Co. v. Fidelity & Casualty Co.*, 281 F.2d 538, 541 (3rd Cir. 1960), they claim that work product exclusions are inapplicable when the insured's work product becomes so integrated into other tangible property that repair or replacement of that work product would entail injury to or replacement of a part of the existing property not originating from the insured. We dispose of this argument by noting that the present case does not fall within the proffered exception, since the repair or replacement of the work product of Turbine Service and Gonzales (*e.g.*, the negligently welded blades) would not necessitate replacement of, or cause injury to, other parts of the LP turbine not originating from the insureds.

Our determination that exclusion (o) applies in this case compels us to resolve several subsidiary questions.

14. For a discussion of the policy considerations underlying "injury to work" exclusions, and presumably underlying their interpretation by the Louisiana courts, see Henderson, "Insurance Protection for Products Liability and Completed Operations—What Every Lawyer Should Know," 50 *Neb.L.Rev.* 415, 441–42 (1971).

The first such question is: What precisely is the insured's work product? Citing, *Engine Service, Inc. v. Reliance Insurance Company*, 487 P.2d 474 (Wyo.1971), *Franks v. Guillotte*, 248 So.2d 626 (La.App.1971), and *Suwyn v. Auto-Owners Insurance Co.*, 15 Mich.App. 279, 166 N.W.2d 549 (1968), Travelers and Sentry contend that the insured's work product is the entire LP turbine, and that exclusion (*o*) consequently excludes coverage for the entire cost of repairing the turbine. Turbine Service and Gonzales insist that their work product is merely the specific components they attempted to repair, and that exclusion (*o*) at most eliminates coverage for the cost of repairing or replacing those components.[15]

The most analogous and instructive case addressing this issue is *Travelers Insurance Co. v. Volentine*, 578 S.W.2d 501 (Tex.Civ. App.1979). In *Volentine*, a repairer's negligent performance of a valve job on a customer's automobile engine resulted in the destruction of the entire engine. The repairer's insurance company contended that the "injury to work" exclusion eliminated coverage for the damages sought by the customer. After noting that this exclusion eliminates coverage only for damages to the work product itself, the court stated:

> The decisive question then becomes: What was Volentine's work product? The entire engine, or merely the valve repair?
>
> [J]udged by the allegations of the petition, it appears that Volentine's work or work product was the repair of the valves only, and that other parts of the automobile engine would constitute "other property".... To the extent those other parts were damaged or destroyed and Volentine is liable therefor, the policy affords coverage.

*Id.* at 504.

We find the court's analysis in *Volentine* persuasive. In our judgment, exclusion (*o*)

carves out of the policy damage to the particular work performed by the insured, but not the overall damage that the incorporation of the defective work product causes to the entire entity. *See Western Casualty & Surety Co. v. Polar Panel Co.*, 457 F.2d 957, 960 (8th Cir. 1972). The cases relied upon by the insurers, *Franks, Engine Service* and *Suwyn*, are distinguishable on the ground that the repairers in those cases overhauled the entire engine, rather than merely repaired and replaced a limited number of engine components. Although the insurers claim that their insureds effectively overhauled the entire LP turbine, this contention is plainly contrary to the facts. Indeed, the insurers elsewhere argue vociferously that while the LP turbine needed a complete overhaul, the repairs undertaken by the insureds were relatively minor.

The second subsidiary question is: Does exclusion (*o*) exclude coverage for damage to the insured's entire work product or merely to the defective components of that work product? Citing, *Pittsburgh Bridge & Iron Works v. Liberty Mutual Insurance Co.*, 444 F.2d 1286 (3rd Cir. 1971) and *S. L. Rowland Construction Co. v. St. Paul Fire & Marine Insurance Co.*, 72 Wash.2d 682, 434 P.2d 725 (1967), Turbine Service and Gonzales argue that the exclusion applies only to the defective components. The trouble with this argument is that the cases supporting it construed a different provision than the one here at issue. The provision at issue in *Pittsburgh Bridge* and *Rowland Construction*, was exclusion (h)(4), a predecessor of the present exclusion (n) and (*o*). Exclusion (h)(4) excluded coverage for damage to "products ... manufactured, sold, handled or distributed ... by the insured, or work completed by or for the insured, out of which the accident arises." The court in *Pittsburgh Bridge* and *Rowland Construction* correctly found that the clause "out of which the accident arises"

---

15. Gonzales cites several non-Louisiana cases for the proposition that exclusion (*o*) excludes coverage only for the cost of purchasing replacement parts, and not for the costs incurred in removing or replacing defective parts from an entity into which they have been incorporat-ed. We reject this proposition as contrary to the Louisiana courts' categorical determination that the "injury to work" exclusion excludes the cost of repairing or replacing an insured's defective work.

was ambiguous, and resolved the ambiguity in favor of the insured by holding that exclusion (h)(4) applied only to the specific defective component that caused the accident.

In 1966 the insurance industry revised this exclusion to make clear that it applied to the insured's entire work product. *See* F.C. & S. Bulletins, Public Liability, Prb 3 & 4 (Dec.1972), *quoted in* 2 Long, *supra*, § 11.13 at 11–70. The revised "injury to work" exclusion appears in the policies insuring Turbine Service and Gonzales and expressly excludes "property damage to work performed . . . arising out of the work *or any part thereof*, or out of materials, parts or equipment furnished in connection therewith." (emphasis added). The courts have consistently held that this language unambiguously excludes coverage for the cost of repairing or replacing non-defective as well as defective components of the insured's work product. *See, e.g., Indiana Insurance Co. v. DeZutti*, 408 N.E.2d 1275, 1279–80 (Ind.1980); *Timberline Equipment Co. v. St. Paul Fire & Marine Insurance Co.*, 281 Or. 639, 576 P.2d 1244, 1246–47 (1977); *Adams Tree Service, Inc. v. Hawaiian Insurance & Guaranty Co.*, 117 Ariz. 385, 573 P.2d 76, 78–80 (Ariz.App.1977) (citing cases). The Louisiana courts join in this interpretation. *See Franks v. Guillotte*, 248 So.2d 626 (La.App.1971) (repairer overhauling automobile engine negligently replaced filterhead, causing damage to entire engine; "injury to work" exception held to exclude all coverage).

We conclude then, that exclusion (o) eliminates coverage for the cost of repairing or replacing any components of the insured's work product that required such repair or replacement as a result of the insured's negligence, whether or not such components were themselves defective.

The final subsidiary question is: Does exclusion (o) exclude coverage, not only for the immediate cost of repairing or replacing the insured's work product, but also for other economic losses caused by the insured's faulty workmanship?

Travelers and Sentry urge with particular alacrity that exclusion (o) excludes damages for loss of use of the KATRIN—by far the largest element of damages in this case. Two cases appear at first glance to support their position. In *Employers Casualty Co. v. Brown-McKee, Inc.*, 430 S.W.2d 21 (Tex. Civ.App.1968 writ ref'd. n. r. e.), an agricultural company sued a builder for loss of storage revenue allegedly caused by the builder's improper construction of a grain elevator. The court determined that the agricultural company was in effect seeking damages for loss of use of the elevator, that such loss of use was merely an element of damage to the elevator, and that the work product exclusion eliminated coverage for such damages. *Id.* at 27. Similarly, in *Adams Tree Service, Inc. v. Hawaiian Insurance & Guaranty Co.*, 117 Ariz. 385, 573 P.2d 76, 78–80 (Ariz.App.1977), a contractor converted a tractor truck into a dump truck. When the dump truck subsequently collapsed, its owner was awarded damages against the contractor for, among other things, loss of use of the truck. In a later suit to determine whether this liability was covered by the contractor's liability policy, the court held that the dump truck constituted the contractor's product, that loss of use of the truck was merely an element of property damage to the truck, and that the "injury to product" exclusion eliminated coverage for such damages.

Upon examination, *Brown-McKee* and *Adams Tree Service* are clearly distinguishable from the present case. What was lost to use in those cases was the insured's own product—a grain elevator in *Brown-McKee* and a dump truck in *Adams Tree Service*.[16] On the other hand, what was lost to use in the present case—the KATRIN—was property other than the insured's own product.

---

**16.** We note in passing that it is not clear whether the Louisiana courts would hold loss of use even of the insured's own defective work product to be excluded under exclusion (o). *See Borden, Inc. v. Howard Trucking Co.*, 372 So.2d 242, 244 (La.App.), *writ refused*, 373 So.2d 544 (1979); *but see Goodwin Well Service, Inc. v. Goss Construction Co.*, 380 So.2d 1246, 1247–48 (La.App.1980).

A case more nearly on point is *Oliver B. Cannon & Son, Inc. v. Fidelity & Casualty Co.*, 484 F.Supp. 1375 (1980). In that case a contractor negligently prepared and painted the interior linings of chemical process tanks, resulting in deterioration of the linings and loss of use of the tanks. The court determined that while the "injury to work" exclusion eliminated coverage for the cost of repairing the linings, it did not eliminate coverage for loss of use of the tanks.

The answer to the question posed above may be discerned in the law of Louisiana. As we have seen, the Louisiana courts hold that the "injury to work" exclusion excludes the cost of repairing or replacing the insured's work product. Those courts also hold that the exclusion does not exclude damages to property other than the insured's work product. *Hendrix Electric Co. v. Casualty Reciprocal Exchange*, 297 So.2d 470, 472–73 (La.App.1974); *Hospital Service District No. 1 v. Delta Gas, Inc.*, 171 So.2d 293, 299 (La.App.) *writ refused*, 247 La. 673, 173 So.2d 540 (1965); *Vobill Homes, Inc. v. Hartford Accident & Indemnity Co.*, 179 So.2d at 497.

Although the Louisiana courts have not addressed the precise question before us, the two principles set forth above appear sufficiently clear to light the way to an answer. At the risk of oversimplification, it appears that all economic losses suffered by the KATRIN's Owners may be attributed either to the "down time" of the KATRIN or to the repair or replacement of the work product of Todd, Turbine Service and Gonzales. Since the KATRIN is indisputably property other than the insured's work product, any damages attributable to its "down time" are not excluded by exclusion (*o*). On the other hand, some of the "out-of-pocket" expenses awarded to the KATRIN's Owners are clearly part of the cost of repairing the faulty workmanship of Turbine Service and Gonzales, and consequently are excluded from coverage by exclusion (*o*).

We conclude, then, that Travelers and Sentry are liable for those damages attributable to the KATRIN's "down time", such as damages for loss of use of the vessel, general expenses from the master's accounts, and pilotage, wharfage, tug, repatriation and recrewing expenses. However, Travelers and Sentry are not liable for any costs incurred in repairing and replacing the work product of their insureds, including the cost of inspecting, crating, shipping, and reinstalling the LP turbine. We remand to the district court for determination of the exact amount of Travelers' and Sentrys' liability.[17]

■ Finally, we address the Owners' contention that the district court erred in failing to hold the defendants liable for damages suffered by the KATRIN in the Cork casualty. The district court found that the damages were caused by excessive blade tip clearances between the feather tips of the HP rotor blades and the HP casings, and it further found that no repairer filed or ground the feather tips of the HP rotor blades or otherwise caused excessive tip clearances. It is undisputed that in February of 1976, the Owners learned of the excessive tip clearances and learned that they would decrease the HP turbine's efficiency, increase consumption of fuel oil, and increase the HP turbine's exhaust temperatures. Owners nevertheless ordered the KATRIN to take on cargo and leave New Orleans the following month.

The Owners accept the district court's findings that the Cork casualty was caused by excessive tip clearances but argue that the court erred in not finding that the defendants' negligence caused the excessive clearances. Specifically they contend that the evidence established that the tip clearances were satisfactory in February 1975 (since those who examined the HP turbine at that time made no mention of excessive tip clearances); that Turbine Service per-

---

**17.** The district court found the "injury to products" and "injury to work" exclusions applicable in this case. *See* 467 F.Supp. at 1312. However, because the court did not exclude coverage for all costs incurred in repairing and replacing the insured's work product, redetermination of the amount of those costs is necessary.

sonnel ground the sides of the HP rotor blades; that the feather tips were ground by man and not by any casualty; and that the clearances were excessive in February 1976 when the KATRIN left Todd Shipyards. The Owners conclude that the excessive tip clearances were caused by defendants' filing or grinding of the feather tips during the "repairs".

The Owners further take the position that their operation of the KATRIN with knowledge of the excessive tip clearances was reasonable under the circumstances because the turbine's manufacturer had indicated that the excessive blade clearances would not cause a major casualty under normal operating conditions, and what happened off the coast of Cork was an abnormal fortutious circumstance which required the vessel to reduce speed which accentuated the excess clearances; that substantial and lengthy repairs would have been required to rectify the condition in New Orleans; that Owners felt obliged to mitigate damages by making the KATRIN productive again; and Owners were anxious to end the KATRIN's long and inhospitable stay in New Orleans.

We are unpersuaded. The district court found, and we agree, that only two facts are clear concerning the HP rotor blade clearances; that they were (1) normal in 1975 and (2) excessive in February of 1976. There was no evidence that connected Todd, Turbine Service or Gonzales with the excessive clearances. As the district court stated, "[w]hat happened in the meantime is anyone's guess." It was undisputed that it would take almost 130 man hours to file off the tips, but no one saw or knew of any filing and no invoice showed any labor cost for such work. We are convinced that the court's finding that no repairer caused the excessive tip clearances is not clearly erroneous.

To summarize our disposition of the issues on appeal, we affirm the judgment of the district court holding the defendants Todd, Turbine Service and Gonzales liable to Owners in damages for the improper repair of the LP turbine rotor. We affirm the judgment of the district court requiring indemnification of Todd by Turbine Service and Gonzales, and the denial of indemnification of Turbine Service by Gonzales.[18] We conclude that the district court erred in finding Todd guilty of gross negligence. We disagree with the district court's calculation of the loss of use time of the KATRIN since it failed to apply the percentage of operation time for the period involved. Such application results in a reduction of the loss of use damage from $645,000.00 to $498,000.00 and the district court is directed to modify its judgment accordingly. We affirm the courts' judgment awarding attorneys' fees to Owners. We direct the district court to include in its judgment an award for pre-judgment interest. We reverse the judgment of the district court holding that exclusion (o) of the Travelers

---

18. Turbine Service asks us to recitify an error in the district court's calculation of damages. It points out that the sum of $221,393.76 was awarded to Owner for restoration of the LP turbine. This figure is included in the Todd damages of $1,142,446.21. This was reduced by the "savings made possible" figure of $174,813.00, leaving a balance due from Todd to Owners of $967,633.00. In reconciling the accounts between Todd and Turbine Service, the same figure of $221,393.76 was used. Todd was given a credit of $174,813.00 which represented Todd's contract price including profit. The district court then attempted to award Turbine Service its unpaid invoices of $125,818.75 but did so by crediting the figure against $221,393.76 instead of crediting it against Turbine Service's 50% share of Todd's indemnity claim of $967,633.00. But the $967,633.00 total due from Todd to Owners already included the $221,393.76 charge for restoration. Hence this latter charge was incorporated twice in the court's damage summaries despite its apparent intention of dealing with them separately. Unless there is a deduction of Turbine Service's unpaid invoices for $125,818.75 and Travelers' uninsured portion (yet to be determined by the district court on remand), from one half of the indemnity expenses, Todd will come out ahead and Travelers will not receive credit for its invoices.

Since the district court must recalculate the damages on remand, as well as determine Travelers uninsured amount under its policy, we leave it to the district court to make a final determination of damages with respect to all parties.

and Sentry policies are not applicable, and direct the district court on remand to determine the amount of the insurers' liability. We affirm the judgment of the district court exonerating the defendants from liability for damage suffered by the KATRIN in the Cork casualty.

AFFIRMED IN PART, MODIFIED IN PART, REVERSED IN PART, AND REMANDED for further proceedings not inconsistent with this opinion.