UNITED CAPITOL INSURANCE
COMPANY, Plaintiff,

v.

SPECIAL TRUCKS, INC., Defendant.

No. 1:95–CV–148.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Jan. 30, 1996.

Catherine C. Ediger, G. Martin Cole, Rothberg, Gallmeyer, Fruechtenicht and Logan, Fort Wayne, IN, Robert B. Lueck, Kristin L. Jenny, Boornazian, Jensen and Garthe, Walnut Creek, CA, for plaintiff.

Thomas M. Shoaff, Jeffrey A. Townsend, Baker and Daniels, Fort Wayne, IN, for defendant.

## MEMORANDUM OF DECISION AND ORDER

WILLIAM C. LEE, District Judge.

This case is before the Court on cross-motions for summary judgment. Plaintiff United Capitol Insurance Company ("United Capitol") filed a Declaratory Judgment action on May 19, 1995, and Defendant Special Trucks, Inc. ("Special Trucks") filed an Answer on June 30, 1995. On October 6, 1995, Plaintiff filed a Motion for Summary Judgment. Defendant filed its Motion for Summary Judgment on October 10, 1995. Defendant also filed, on December 12, 1995, a Motion for Leave to File Amended Answer With Counterclaim. For the following reasons, plaintiff's Motion for Summary Judgment is GRANTED in part and DENIED in part, and defendant's Motion for Summary Judgment is GRANTED in part and DENIED in part. Defendant's Motion for Leave to File Amended Answer with Counterclaim is DENIED.

## FACTUAL BACKGROUND

Considering the complex nature of the issues raised in this summary judgment action and the contentious manner in which they are being debated, the underlying facts in this case are actually straightforward and, for the most part, undisputed. Defendant Special Trucks, an Indiana corporation, contracted with Calavar Corporation ("Calavar"), a Texas corporation, to build a truck chassis (including chassis, driveline and cab) onto which Calavar would add an "aerial boom." The truck would then be used by Pacific Utility Equipment Company ("Pacific

Utility") for servicing power lines and equipment in Oregon. Special Trucks completed the chassis and shipped the finished truck to Calavar. Calavar completed the addition of the aerial boom assembly. Pacific Utility took delivery of the vehicle in Texas and intended to drive it to Oregon. Somewhere near Albany, Oregon, the truck crashed and was severely damaged. Pacific Utility sued Calavar and Special Trucks in U.S. District Court in Oregon, alleging that the crash was the result of defects in the work of Special Trucks and Calavar. Pacific Utility argued at trial that the crash was the result of a wheel which broke, causing the truck to veer out of control. A jury found for the plaintiff and awarded damages of $457,310.00.[1] Prior to trial, Special Trucks and Calavar entered into an agreement whereby United Capitol, on behalf of Special Trucks, paid Calavar $43,020.00 to settle any indemnity claims Calavar might have against Special Trucks.

At the time of the accident, Special Trucks was covered by a commercial general liability policy. The insurer, United Capitol, tendered a defense on behalf of Special Trucks pursuant to a reservation of rights. At some point (Special Trucks claims it was during the trial), United Capitol informed Special Trucks that it was denying coverage pursuant to certain exclusionary language in the policy. United Capitol maintains that approximately $288,900.60 in damages are covered by the policy and $168,409.40 in damages are not covered. In addition, United Capitol claims that it is entitled to recover from Special Trucks the $43,020.00 it paid in settlement to Calavar. The current Declaratory Judgment action was filed to determine the coverage and damages issues.

### SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P.

56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago,* 916 F.2d 1254, 1256 (7th Cir. 1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 252, 106 S.Ct. at 2512; *In re Matter of Wildman,* 859 F.2d 553, 557 (7th Cir.1988); *Klein v. Ryan,* 847 F.2d 368, 374 (7th Cir.1988); *Valentine v. Joliet Township High Sch. Dist. No. 204,* 802 F.2d 981, 986 (7th Cir.1986). No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 322 (7th Cir.1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553. The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the plead-

---

1. The jury awarded a lump-sum verdict. However, the parties hereto have stipulated that the damages break down to the following categories and amounts: 1) property damage of $287,310.00; 2) incidental damages of $27,185.00; and 3) loss of use damages of $142,815.00.

ings alone is not sufficient to withstand summary judgment. *Goka v. Bobbitt,* 862 F.2d 646, 649 (7th Cir.1988); *Guenin v. Sendra Corp.,* 700 F.Supp. 973, 974 (N.D.Ind.1988); *Posey v. Skyline Corp.,* 702 F.2d 102, 105 (7th Cir.), *cert. denied,* 464 U.S. 960, 104 S.Ct. 392, 78 L.Ed.2d 336 (1983). In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses. *Anderson,* 477 U.S. at 249–251, 106 S.Ct. at 2511. However, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate. *Mason v. Continental Illinois Nat'l Bank,* 704 F.2d 361, 367 (7th Cir.1983).

 Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. Fed.R.Civ.P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. at 1356; *First Nat'l Bank of Cicero v. Lewco Sec. Corp.,* 860 F.2d 1407, 1411 (7th Cir. 1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson,* 477 U.S. at 251–252, 106 S.Ct. at 2512.

### DISCUSSION

The CGL policy that Special Trucks purchased from United Capitol is a standard form policy and contains language presently found in many such policies. The dispute in this suit involves only a few of the policy provisions. The policy states that the insurer "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' included within the 'products-completed operations hazard' to which this insurance applies." Policy, Section I, 1.a. The policy then states in Section I, 2.h. that the coverage *does not apply* to " '[p]roperty damage' to 'your product' arising out of it or any part of it." The policy contains another exclusion in Section I, 2.i., which states that the insurance coverage *does not apply* to " '[p]roperty damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard.' This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor."

Also very relevant to this case is the language in the policy's "Definitions" section. The policy at issue here contains the following definitions:

" 'Products-completed operations hazard' includes all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work....' " Section V, 11.a.

" 'Property damage' means: Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it...." Section V, 12.a.

" 'Your product' means: Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by you...." Section V, 15.a.

" 'Your work' means: Work or operations performed by you or on your behalf; and materials, parts or equipment furnished in connection with such work or operations." Section V, 16.a. and b.

 Indiana has certain well-established rules regarding the interpretation of insurance contracts. "Under Indiana law, the interpretation of an insurance policy presents a question of law to be decided by the court." *Cincinnati Ins. Co. v. Flanders*

*Electric Motor Service, Inc.,* 40 F.3d 146, 151 (7th Cir.1994) (citing *Tate v. Secura Ins.,* 587 N.E.2d 665, 668 (Ind.1992)). "The insured has the initial burden of proving coverage under an insurance policy ... [and] if an insurer relies on an exclusion within a policy to deny coverage, the insurer must establish that the exclusion applies." *Id.* (citing *Southbend Escan Corp. v. Federal Ins. Co.,* 647 F.Supp. 962, 966 (N.D.Ind.1986)). Clear and unambiguous language in an insurance policy must be given its plain and ordinary meaning. *Id.* (citing *Fidelity & Guar. Ins. Underwriters v. Everett I. Brown Co.,* 25 F.3d 484, 486 (7th Cir.1994)). "An unambiguous provision in an insurance policy must be enforced, even if it results in a limitation of the insurer's liability." *Id.* (citing *Interstate Auction, Inc. v. Central Nat'l. Ins. Group, Inc.,* 448 N.E.2d 1094, 1098 (Ind.App.1983)). "However, where the language of an insurance policy is ambiguous, in that it is susceptible to more than one reasonable interpretation, the court must construe the language in favor of the insured." *Id.* (citing *Alexander v. Erie Ins. Exchange,* 982 F.2d 1153, 1157 (7th Cir.1993)). At the same time, "a court cannot create an ambiguity where none exists; 'if no ambiguity exists the policy will not be interpreted to provide greater coverage than the parties bargained for....'" *Id.* (quoting *Alexander,* 982 F.2d at 1157). Also "the mere existence of a controversy as to the meaning of an insurance contract does not establish an ambiguity." *Seymour Manufacturing Co., Inc. v. Commercial Union Ins. Co.,* 648 N.E.2d 1214, 1218 (Ind.App. 1995) (citing *Harden v. Monroe Guaranty Ins. Co.,* 626 N.E.2d 814, 817 (Ind.App.1993), *trans. denied* ).

### Coverage Issue

█ Simply stated, the coverage issue breaks down to this: United Capitol argues that the truck built by its insured is a "product" as that term is used in the policy. As such, no amount of damage to the product itself would be covered by insurance since the exclusion in Section I, 2.h. specifically precludes coverage for " '[p]roperty damage' to 'your product' arising out of it or any part of it." Thus, argues United Capitol, any damages incurred by Special Trucks which relate to the truck chassis itself (including, as will be discussed later, incidental damages and loss of use damages "flowing" from the non-covered truck chassis) are not covered by insurance based on the plain language of the policy. Plaintiff's Memorandum in Support of Motion for Summary Judgment, p. 4.

Special Trucks argues that the construction of the truck fits equally well under the definition of "your work" as defined in Section V, 16.a. and b. Special Trucks states that since the wheel that broke and caused the accident was purchased from a third-party vendor, that third party vendor constituted a subcontractor. Therefore, argues Special Trucks, the exception to exclusion 2.i. is brought into play and coverage will lie. Defendant's Brief in Support of Motion for Summary Judgment, p. 3.

The policy at issue defines "product" as "[a]ny goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by you...." Section V, 15.a. The court was unable to locate any Indiana or Seventh Circuit case law dealing with the definition of "product" as that term is used in CGL insurance policies, and, in fact, neither party in this case cites any case that specifically defines the term. The Ninth Circuit offers some assistance in the case of *Hydro Systems, Inc. v. Continental Ins. Co.,* 929 F.2d 472 (9th Cir.1991), wherein the court wrote:

> Several courts have examined the meaning of the term "product" as it relates to product hazard exceptions. The majority of courts "define 'products' as goods or services which the insured deals in as his stock or trade." *CPS Chem. Co. Inc. v. Continental Ins. Co.,* 199 N.J.Super. 558, 489 A.2d 1265, 1270 (1984) (holding that "industrial wastes" were not products under a products hazard exception because they were "not intended for consumption, sale or use by others ..."); *see also Paxton–Mitchell Co. v. Royal Indemn. Co.,* 279 Or. 607, 569 P.2d 581, 587 (1977) (interpreting "product" in the absence of a contractual definition as referring to those things in which the insured "trades or deals"). 929 F.2d at 475.

The Ninth Circuit referred to this as a "common sense definition of the term 'product.'" *Id.* In addition, the policy at issue in the *Hydro Systems* case contained exactly the same definition of "product" as is found in the United Capitol policy. Clearly, the truck that was manufactured by Special Trucks was intended for "sale or use by others" and constituted "goods or services" of the kind in which Special Trucks deals.

Special Trucks cites several cases wherein courts have used the terms "work" and "product" interchangeably when dealing with the interpretation of insurance policies. Special Trucks seems to argue that these cases establish that the terms are synonymous and therefore the separate exclusionary provisions at issue can be applied interchangeably. It is true that the cases cited by Special Trucks use the terms "work," "work product," and "product" interchangeably when discussing policy exclusions similar (in some cases identical) to the exclusions in the present case. However, the courts in those cases simply refer to the "product" exclusion and the "work" exclusion collectively while explaining why they do or do not preclude coverage based on the facts of each specific case. None of the cases expressly hold that the two exclusions are essentially one, or that the presence of both in an insurance policy creates an ambiguity.

For example, Special Trucks cites the case of *Honeycomb Systems, Inc. v. Admiral Ins. Co.*, 567 F.Supp. 1400, 1408 (D.Maine 1983). Again, policy language virtually identical to that found in this case was involved in the *Honeycomb* case. There, the insurer was arguing that the "work performed" and "product" exclusions encompassed all the damages incurred in the case and precluded any coverage. The court, in explaining the insurer's position, stated that: "[Insurer's] contention is that the plain terms of [the] exclusions ... encompass all aspects of the damages claimed by [owner], since *it is undisputed that the 22–foot dryer is [insured's] 'product' or 'work performed by or on behalf of' [insured]."* *Id.* (Italics added). The fact that most distinguishes *Honeycomb* from the present case is that the insured in *Honeycomb* both ·manufactured the product and

installed it. So, while the court refers to the manufacture and installation of the dryer into owner's paper machine as both "product" and "work," it never directly addressed the issue of whether the dryer constituted one or the other, since the parties apparently were not disputing that specific issue.

United Capitol, in responding to Special Truck's contention that the truck in question could just as well fall under the "work performed" exclusion as the "product" exclusion, relies heavily on the widely cited case of *Indiana Insurance Co. v. DeZutti,* 408 N.E.2d 1275 (Ind.1980). In that case, the insured contractor constructed a home which was later severely damaged because the footings supporting it (which had been installed by a subcontractor) had been improperly installed. The policy contained exclusionary language virtually identical to the "work" and "product" language found in the United Capitol policy. The Indiana Supreme Court held that the entire house constituted the insured's "product" for purposes of determining the scope of coverage. Surely, United Capitol argues, if the Indiana Supreme Court deems the construction of a house a "product" rather than "work" for purposes of interpreting a CGL policy, then the manufacture of a truck cannot be characterized any differently.

While United Capitol does not seem to quote this sentence anywhere in its three briefs, the Indiana Supreme Court in *DeZutti* stated its interpretation of the terms "work" and "product." The court wrote that "the term 'work' refers to the negligent or incorrect manner in which the job was done, whereas 'product' means that the item made or sold is somehow defective or deficient in itself." 408 N.E.2d at 1280. By this definition, it appears that the manufacture of a truck chassis for sale to a customer would fall more accurately within the definition of "product" rather than "work."

Special Trucks makes a gallant effort in its briefs to pigeonhole its manufacture of the truck into the admittedly broad policy definition of "your work" in order to attempt to

invoke full coverage.[2] However, as stated earlier, it is the duty of this court to give clear and unambiguous language in an insurance policy its plain and ordinary meaning. *Cincinnati Ins. Co.*, 40 F.3d at 151. Further, "a court cannot create an ambiguity where none exists. . . ." *Id.* Also, the "mere existence of a controversy as to the meaning of an insurance contract does not establish an ambiguity." Seymour Mfg. Co., 648 N.E.2d at 1218 (Ind.App.1995). The court finds that the truck in issue in this case constitutes a "product" as that term is used in the policy.

### *Damages Issue*

### 1. Property Damage and Loss of Use

As previously stated, the language in the CGL policy in this case is extremely common in virtually all such policies currently sold. The "your product" and "your work" exclusions "are commonly referred to as business risk exclusions." *Home Indemnity Co. v. Wil–Freds, Inc.*, 235 Ill.App.3d 971, 175 Ill. Dec. 884, 887, 601 N.E.2d 281, 284 (1992). Such exclusions are designed to preclude coverage for risks that can be most easily avoided by the insured company itself. As one very frequently quoted commentator explained:

> The risk intended to be insured is the possibility that the goods, products or work of the insured, once relinquished or completed, will cause bodily injury or damage to property other than to the product or completed work itself, and for which the insured may be found liable. The coverage is for tort liability for physical damages to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained. *Indiana Insurance Co. v. DeZutti*, 408 N.E.2d 1275 (Ind.1980)

(quoting Henderson, *Insurance Protection for Products Liability & Completed Operations—What Every Lawyer Should Know*, 50 Neb.L.Rev. 415, 441 (1971)).

It has also been frequently noted that the rationale behind the types of exclusions at issue in this case is that liability insurance is not intended to act as a warranty or to serve as a performance bond. *DeZutti*, 408 N.E.2d at 1279; *Wil–Freds*, 601 N.E.2d at 285. "The stated intent of the CGL policy form is to exclude coverage for contractors' 'business risks' while protecting contractors against consequential damages." Franco, *Insurance Coverage for Faulty Workmanship Claims Under Commercial General Liability Policies*, 30 Tort & Ins.L.J. 785 (Spring 1995). As author Franco further explains:

> In sum, poor performance is a cost of doing business; it is not a part of the insurance objective of shifting risk. A contractor's poor performance is outside the scope of CGL coverage. Franco at 786–787 (citing *Vari–Builders, Inc. v. U.S. Fidelity & Guar. Co.*, 523 A.2d 549, 552 (Del.Supr.Ct.1986)). The risk of replacing and repairing defective materials or poor workmanship has generally been considered a commercial risk that is not passed on to the liability insurer. Rather liability coverage comes into play when the insured's defective materials or work cause injury to property other than the insured's own work or products. . . . CGL policies are not intended to cover the replacement or repair of contractors' work. *Id.* at 787.

The parties in the present case do not dispute the fact that Special Trucks must absorb the cost of repairing its product. They do, however, vehemently argue about how much it actually cost to repair the chassis. According to Special Trucks, the total

---

**2.** Assuming for the sake of argument that the production of the truck was considered "work" rather than "product" for coverage purposes, Special Trucks would still have to establish that FTC Inc., the company that sold Special Trucks the wheels for the truck in question, was a subcontractor in the project with Calavar rather than simply a vendor of parts. Only then would the exception to exclusion 2.i. come into play. The argument presented by Special Trucks on that issue was not convincing. Furthermore,

Special Trucks would have to establish that what FTC did in providing the wheels constituted "work performed" by that company in order for the exception to be invoked. In light of the court's discussion regarding the meaning of the terms "product" and "work," it is extremely doubtful that Special Trucks could successfully argue that what FTC did constituted the performance of work, as opposed to providing a product.

cost of repair was $37,763.63. See October 9, 1995 affidavit of Special Trucks co-president Michael Baum, ¶ 13. However, Special Trucks argues that only $29,436.50 should be excluded from coverage, as that is the actual amount it cost Special Trucks to repair its chassis as a result of the accident. Special Trucks states that additional expenses of $8,327.13 were incurred in repairing the chassis, bringing the total to $37,763.63, but that these expenses are not excluded from coverage since they consisted of purchasing replacements for parts of the truck which were not damaged in the accident. Rather, these parts were removed from the truck before it was shipped to Special Trucks for repair. See October 9, 1995 affidavit of Micheal Baum, ¶¶ 12 and 13. Special Trucks in its briefs states that said parts were stolen off the truck. Defendant's Reply Brief in Support of Motion for Summary Judgment at p. 11. Consequently, Special Trucks argues that the additional $8,327.13 in repair costs were not the result of the faulty product. United Capitol presents no evidence whatsoever to refute Special Truck's assertion that $8,327.13 in parts were removed from the truck at some point following the accident.

■ Not surprisingly, United Capitol takes a much different approach to deciding which expenses are covered and which are not. United Capitol takes the position that damages should be apportioned between covered items and non-covered items, according to a "cogent, logical formula." Plaintiff's Memorandum in Support of Motion for Summary Judgment at p. 15. In a subsequent brief, after having this apportionment argument challenged by Special Trucks on the basis that United Capitol cited absolutely no authority for it, United cited the case of *Vari Builders, Inc. v. United States Fidelity and Guaranty Co.*, 523 A.2d 549 (Del. Supr.Ct.1986). Reply to the Opposition of Special Trucks, Inc. to Plaintiff United Capitol's Motion for Summary Judgment at p. 4. United Capitol states that "Vari Builders involved a situation where incidental damages ... were apportioned between those incurred as a result of non-covered damages and those incurred as a consequence of covered damages. The court approved the apportionment." *Id.* However, a careful reading of *Vari Builders* reveals no such holding. In that case, a homebuilder was sued by homeowners after their home and personal property were damaged due to the builder's faulty workmanship. Plaintiffs sued to recover for the damage to their home, and for consequential damages such as storage and relocation expenses. The court held that the business risk exclusion or product exclusion precluded coverage for damage to any part of the house since that constituted damage to the work of the insured. The court reasoned that since the damage to the house was not damage covered under the insurance policy, all consequential damages related to that non-covered item were also not covered. Consequently, the court ruled that no coverage existed for any of the damages claimed in the case. It requires a leap of faith to interpret the holding as approving an apportionment of damages between covered and non-covered items. The holding in *Vari Builders* implies that had the damage to the house itself been covered under the policy, then the consequential damage related to that covered item might also be covered. However, the court does not even mention the concept of apportionment.

United Capitol admits that "there is no Indiana authority addressing the issue of apportionment of incidental damages or loss of use damages between covered and non-covered property damage." *Id.* at p. 6. United Capitol goes on to argue that "... Special Trucks has offered no Indiana authority disallowing such an apportionment." *Id.* Special Trucks counters that "[i]t is difficult ... to find cases directly in conflict with a proposition that has never before been propounded." Defendant's Reply Brief at p. 11.

United Capitol states that the parties stipulated at the underlying trial of this matter that "the cost of repair to the entire mobile aerial lift vehicle was $152,942.00.... $51,717.00 of the total repair figure is attributable to the chassis, and $101,225.00 to the boom. Thus, the ratio of the repair cost is 66% for the boom, and 33% for the chassis." Plaintiff's Memorandum in Support of Motion for Summary Judgment at p. 14. Special Trucks argues that "[i]f United Capitol had argued for some type of apportionment

in good faith, it would have compared the amount of the stipulated property damage ($287,310) with the actual cost of repair ($29,436.50) for a ratio of 90/10, not United Capitol's suggested 66/34." Brief in Opposition to Motion for Summary Judgment at p. 7. United Capitol stated during oral argument that the repair figure of $51,717.00 was the retail figure, i.e., the amount Calavar Corporation billed its client for repair of the chassis. But United Capitol does not argue that the cost of repair, and therefore the amount that should be excluded from coverage, is $51,717.00. Instead, United Capitol goes one giant step further in its argument. United Capitol argues that its 66%/34% ratio should be applied to the total property damage award in the underlying case. That would mean that Special Trucks would be responsible for just over $97,000.00 of the total property damage award of $287,310.00, despite the fact that the actual cost of repair was just over $37,000.00. The court disagrees with United Capitol's assertion that such an apportionment represents a "cogent, logical formula." Instead, it appears that United Capitol is attempting to pass along much of its own responsibility to pay the jury award, a responsibility imposed upon it by the terms of its policy. Special Trucks cannot and should not be penalized for United Capitol's failure to convince the jury in the underlying case that the property damage award should be less than $287,310.00.

Since the parties do not dispute that Special Trucks has no insurance coverage for the cost of repairing the chassis, the duty of the court on this issue is to determine what that amount is. It is the responsibility of Special Trucks to repair its damaged product and make it whole. Special Trucks affirmatively states that the cost of repair was $37,763.63. That amount is properly excluded from coverage. While it is true that the $8,327.13 in lost or stolen parts is not an amount that can be said to have directly resulted from the accident (that is to say, it is not the result of any faulty workmanship of Special Trucks), that fact does not in and of itself mean that the amount should be covered by the United Capitol policy.[3] On the contrary, the express language of the policy would clearly exclude this sum. The policy expressly states that it does not apply to " '[p]roperty damage' to 'your product' arising out of it or any part of it." The missing or stolen parts are clearly damage to the product of Special Trucks. As such, it is clearly not "property damage ... to which this insurance applies." Policy, Section I, 1.a. As discussed previously, the type of CGL policy at issue here is designed to provide coverage to an insured for damages sustained by third parties as a result of the faulty workmanship of the insured.

Essentially, Special Trucks is arguing that the additional repair amount is not the company's fault and that it would be unfair to assess that amount against the company. That may be true, but it is equally true that charging that amount to United Capitol would be just as unfair, since it is not the type of loss intended to be covered by the policy. The proper remedy for Special Trucks is to recover the $8,327.13 from the thieves who stole the parts or the party responsible for allowing the parts to be removed.[4]

For the foregoing reasons, the court finds that the amount of repair to the product of Special Trucks is $37,763.63 and that amount is properly excluded from coverage.

As to the loss of use damages, both parties stipulated that this amounted to $142,815.00. Again, United Capitol argues that its 66%/34% apportionment theory should be applied, and again the court finds this argument unpersuasive. The policy expressly defines "property damage" as

---

3. Of course, it could be argued that the lost or stolen parts were an *indirect* result of the faulty workmanship of Special Trucks. That is, but for the faulty workmanship, the truck might not have been in a position where parts could be so easily lost or stolen. Using that logic, the additional $8,327.13 would clearly be the responsibility of Special Trucks.

4. For example, if Special Trucks had had the damaged truck impounded at some commercial lot and the loss or theft occurred at that lot, then Special Trucks would, subject to the terms of any bailment agreement, have to seek recovery from the bailee. It could not seek to recover the amount pursuant to its CGL policy.

"[p]hysical injury to tangible property, *including all loss of use* of that property." Policy, Section V, 11.a. (italics added). Thus, loss of use damages are clearly covered in the subject policy and by the facts of this case. In fact, United Capitol is not arguing that such damages are excluded. Rather, the company is arguing that, like incidental damages (discussed below), loss of use damage should be apportioned according to that loss of use that is attributable to a covered item (the aerial boom) and that portion that is attributable to a non-covered item (the chassis). Since there is no way to determine a proper apportionment ratio, United Capitol again urges the court to apply its "cogent, logical" figure of 66%/34%. This would make Special Trucks responsible for over $48,-000.00 in loss of use damages—damages that are expressly covered pursuant to the terms of the policy.

On the issue of loss of use damages, Special Trucks cites several cases wherein courts in other jurisdictions have addressed such damages in light of "work product exclusions" of the type at issue in the present case.[5] Special Trucks relies primarily on the case of *Honeycomb Systems, Inc. v. Admiral Ins. Co.*, 567 F.Supp. 1400 (D.Maine 1983). In that case, the insured built a 22-foot dryer which was installed in a larger machine owned and operated by Scott, a paper company. When the dryer failed, the paper company sued the insured. Insured later brought a declaratory judgment action against its insurer, Admiral. The insurance policy contain exclusions similar to the ones in the present case. Admiral argued that since the only physical damage sustained was to the dryer itself, the exclusions applied and there was consequently no coverage for any damages. The court rejected Admiral's contention and held that coverage did apply for loss of use damages. The court held that "a significant element of the damages sued upon here is for loss of use of the paper machine, a product owned by Scott, not by Honeycomb. In other words, in its loss of use claim Honeycomb seeks recovery of damages to

Scott resulting from a breakdown of Honeycomb's product; Honeycomb is not seeking damages to its own product, the dryer. The claim for loss of use of the paper machine is therefore not barred by the [exclusionary language]." *Id.* at 1408. Several other cases applied the same reasoning when determining that loss of use damages are not excluded by policy language similar to that present in this case. *See W.E. O'Neil Construction Co. v. National Union Fire Ins. Co. of Pittsburgh,* 721 F.Supp. 984 (N.D.Ill.1989); *Todd Shipyards Corp. v. Turbine Service, Inc.,* 674 F.2d 401 (5th Cir.1982). None of the cases cited by the parties discussed the concept of apportionment of loss of use damages.

For the foregoing reasons, the court holds that the loss of use damages in this case, in the stipulated amount of $142,815.00, are covered, in their entirety, by the subject policy and should not be apportioned.

### 2. Consequential Damages

■ Utilizing a variation of its apportionment theory, United Capitol turns next to the consequential damages—the figure of $27,185.00. United Capitol argues that consequential damages that flow from the covered item (the aerial boom) are themselves covered, while damages flowing from the non-covered item (the chassis) are not covered. The incidental damages are listed as items "A" through "L" in Exhibit G of plaintiff's Memorandum in Support of its Motion for Summary Judgment. United Capitol argues that the covered consequential damage items include the following:

1. Item "A", the bill for services of the local fire department in responding to the accident scene ($520.00);

2. Item "D", the bill from the Oregon State Highway Division for services at the accident scene and for damages to a highway fence ($531.23);

3. Item "G", the bill from Gray's International for loading the boom assembly onto a flatbed for shipment to Calavar in Waco, Texas ($560.00);

---

**5.** The parties acknowledge at various points in their briefs that there is very little case law in the Seventh Circuit addressing the issues raised in this case. The court also found this to be the

case. Nonetheless, the cases from other jurisdictions discussed herein are instructional and are helpful in understanding this court's analysis.

4. Item "H", the bill from GF Motor Freight for shipping component parts of the damaged boom to Texas ($1,022.19);

5. Item "I", the bill from W.T.B., Inc., for shipping the entire boom from Oregon to Texas ($2,385.00).

These five items amount to a total of $5,018.00 in covered consequential damages.

Consequential damages which United Capitol argues are not covered include the following:

1. Item "B", the cost of a Pacific Utility crane to move the damaged unit at the accident scene ($350.00). This expense is not covered, according to United Capitol, because the "towing or moving of the vehicle was directly caused by the inability of the chassis to perform its transportation function due to damage." Memorandum in Support of Motion for Summary Judgment at p. 19.

2. Item "C", a tow bill "for moving the unit, likewise necessitated due to damage to the chassis" ($5,791.00); *Id.*

3. Item "E", "... charges for inspection of the engine, clearly chassis related, and having no relationship to the boom assembly" ($158.00); *Id.*

4. Item "F", the bill for "shipment of the tire and rim parts of the chassis following the tire blowout in California" ($499.00); *Id.*

5. Item "J", "an invoice from Wagner Towing for transporting the damaged chassis from Oregon to Fort Wayne for repair" ($2,450.00); *Id.*

6. Item "K", an invoice for loading the damaged chassis onto a flatbed truck for transport back to Special Trucks ($168.00); *Id.*

7. Item "L", the cost of transporting a new unit from the Calavar plant in Waco, Texas, to the accident site in Albany, Oregon ($12,751.00); *Id.*

These items, which United Capitol argues are not covered, total $22,167.00. United Capitol states that "Allocation of incidental damages is consistent with the plain meaning and purpose of exclusion [2.h.], which is to provide coverage only for the risk of harm to persons or to other property, and not for the business expense to be borne by the insured

for repairing or replacing its own faulty product." That point is well established. *See DeZutti,* 408 N.E.2d 1275 (Ind.1980). The court agrees with United Capitol's position that damages, including consequential damages, related to the repair of the Special Trucks chassis are excluded from coverage, while others may be covered. *See Oscar W. Larson Co. v. United Capitol Ins. Co.,* 845 F.Supp. 445 (W.D.Mich.1993); *Todd Shipyards Corp. v. Turbine Service, Inc.,* 674 F.2d 401 (5th Cir.1982). However, the court is of the opinion that United Capitol's assessment of which of the amounts listed above actually constitute a portion of the cost of repair is not altogether accurate.

Both parties cite the *Todd Shipyards* case as supporting their respective position regarding coverage of consequential damages. In that case, the faulty work product was a turbine on a ship which, when it failed, resulted in loss of use and consequential damages. The court held that the insurance companies were "liable for those damages attributable to the [ship's] 'down time', such as damages for loss of use of the vessel, general expenses from the master's accounts, and pilotage, wharfage, tug, repatriation and recrewing expenses. However, [the insurers] are not liable for any costs incurred in repairing and replacing the work product of their insureds, including the cost of inspecting, crating, shipping, and reinstalling the LP turbine." 674 F.2d at 423.

The reasoning in the *Todd Shipyards* case is in keeping with the very purpose and policy behind a CGL policy which, as has been discussed, is not intended to provide coverage for business risks such as those relating to the replacement or repair of the insured's own product. Thus, in the present case, the consequential damages that are directly related to the process of repairing the damaged chassis are not property damage intended to be covered by Special Trucks' CGL policy, while all other consequential damages would be covered. The task is to categorize the consequential damages properly.

United Capitol is correct that the five items of consequential damages which it claims are covered do indeed fall within the

policy terms since they are clearly not related to the repair of the chassis. However, the court disagrees with United Capitol's characterization of several of the seven items which it claims are excluded from coverage. For example, United Capitol claims that the $350.00 cost of a Pacific Utility crane to move the damaged unit is not covered because it "was directly caused by the inability of the chassis to perform its transportation function due to damage." What United Capitol is attempting to argue with regard to this item and several other, is that expenses that would not have been incurred *but for* the damage to the chassis are not covered. Put another way, any expense that could be said to flow from the damage to the chassis is not covered since the chassis itself is not covered. This reasoning sweeps too broadly and ignores the intended purpose of the CGL policy. If all consequential damages that flowed from the "inability of the chassis to perform" were not covered, as United Capitol asserts, then it would be reasonable to claim that the bill for the fire department (for example) would not be covered because the fire department would never have had to respond but for "the inability of the chassis to perform its ... function."

The proper procedure when categorizing each item of consequential damage is to employ an approach similar to that in the *Todd Shipyards* case, so as not to violate the intended purpose of the policy. In doing so, it is clear that the $350.00 expense for the Pacific Utility crane to assist in clearing the damaged vehicle from the accident scene is not a cost incurred in repairing the chassis and thus would not be excluded from coverage. Likewise, the bill of $5,791.00 for towing the wrecked vehicle from the accident site to a Pacific Utility yard in Portland, Oregon, is not a repair cost and would not be excluded from coverage. Charges of inspection of the engine, in the amount of $158.00, are related to the repair of the chassis and would be excluded from coverage. The $499.00 cost of shipping the tire and rim portion of the chassis following a blowout in California is clearly a cost associated with damage to the insured's own product and would be excluded from coverage. The expense of $2,450.00 for transporting the chas-

sis from Oregon back to Special Trucks is part of the cost of repair and is excluded from coverage. Also, the invoice of $168.00 for loading the chassis onto a flatbed truck for transport back to Special Trucks is likewise part of the cost of repair and is therefore excluded from coverage.

In contrast, the sum of $12,751.00 for costs associated with transportation of the new unit from the Calavar site in Waco, Texas, to the accident site in Albany, Oregon, is clearly not related to the cost of repair of the chassis and therefore would not be excluded from coverage.

In summary, items "A", "B", "C", "D", "G", "H", "I", and "L" are not costs of repairing the insured's own product and therefore are covered by the CGL policy. Items "E", "F", "J" and "K" are associated with the cost of repairing the chassis and therefore would not be covered by the policy.

### 3. Settlement Payment

█ Finally, the parties also debate whether the $43,020.00 paid to Calavar in the settlement agreement is a covered item. United Capitol argues that this amount is not covered because it does not constitute "property damage" as defined in the policy. Special Trucks argues that since United Capitol knew that Calavar would have indemnity rights against Special Trucks if the accident was found to have been caused by a faulty wheel (which of course it was), and since it was United Capitol's idea to settle with Calavar as a tactical matter to prevent Calavar from appearing in court and placing all the blame for the accident on Special Trucks, the settlement amount is properly a cost incurred by United Capitol in its defense of its insured.

The settlement payment of $43,020.00 is comprised of both damages sustained by Calavar and Calavar's attorney fees. The damage amounts total $18,424.40 and include such items as costs to "inspect and repair cylinders ... 70 hours labor to disassemble and reassemble after repairs," "mark up on CAB repairs passed on to Pacific Utility at cost," "non-destruct testing—upper parts," "freight on inspection parts," and "inspect and test ring gear." Also included in this

amount is $1,689.75 in travel expenses incurred by two Calavar representatives who travelled to assess the damage to the unit. Plaintiff's Memorandum in Support of Motion for Summary Judgment, Exh. C. United Capitol argues that these damages are actually purely economic in nature since they were incurred after Calavar accepted the damaged unit as a trade-in from Pacific Utility and provided Pacific Utility with a replacement unit. Therefore, argues United Capitol, the damage is not damage Calavar sustained as a result of the negligence of Special Trucks. That is to say, Calavar did not sustain damage to its unit as a result of the accident since it did not own the unit at the time of the accident. This would be true if Calavar were simply a third party who happened to come along and offer to purchase the damaged unit from Pacific Utility, then turn around and make a claim for damages against the party responsible for damaging the unit in the first place. But that is simply not the case. Calavar was not an arm's length third party purchaser, but rather, a co-defendant with a valid indemnification claim against Special Trucks (even according to United Capitol's own counsel in the underlying action). This is a very different scenario from the one United Capitol urges the court to accept. By the very description of the damages as contained in Plaintiff's Exh. C, it is clear that Calavar sustained property damage of the sort intended to be covered by a CGL policy— property damage sustained by Calavar as a result of the faulty workmanship of Special Trucks. The $1,689.75 in travel expenses would be considered covered consequential damages sustained by Calavar, just as many of the consequential damages suffered by Pacific Utility were covered, as discussed previously.

The parties agree that the only damages excluded from coverage under the express language of the policy are damages to the insured's own product. The damages sustained by Calavar clearly are not damage to the Special Trucks chassis. Therefore, they would be covered unless expressly excluded. United Capitol has the burden of proving that an exclusion applies and precludes coverage. *Cincinnati Ins. Co. v. Flanders Elec-* *tric Motor Service, Inc.*, 40 F.3d 146 (7th Cir.1994). However, United Capitol does not point to any exclusion in the policy that applies to the settlement funds in question.

The remainder of the settlement amount, $24,595.60, was allocated to Calavar's attorney fees. Plaintiff's Memorandum in Support of Motion for Summary Judgment, Exh. C. In Oregon, where the underlying trial took place, an indemnitor would be liable not only for damages assessed against an indemnitee, but also for the indemnitee's reasonable costs of defense. The Oregon Supreme Court held that "[t]he rule in most jurisdictions, regardless of whether indemnity is based upon an implied or an express agreement, is that when a claim is made against an indemnitee for which he is entitled to indemnification, the indemnitor is liable for any reasonable expenses incurred by the indemnitee in defending against such claim, regardless of whether the indemnitee is ultimately held not liable. We so hold." *St. Paul Fire & Marine Ins. Co. v. Crosetti Bros., Inc.*, 256 Or. 576, 475 P.2d 69, 70 (1970) (citations omitted). United Capitol assumed the defense of its insured, Special Trucks, as it was required to do pursuant to the terms of the policy. United Capitol also assumed the defense of Calavar, apparently based largely on its concern about Calavar's indemnity rights against Special Trucks. Defendant's Brief in Opposition to Plaintiff's Motion for Summary Judgment, Affidavit of Michael Baum, ¶ 3. United Capitol has not sought to recover the attorney fees and costs it incurred as a result of defending its insured, and the company cites no authority to support its position that it has a right to recover any of the costs incurred in defending co-defendant Calavar. United Capitol also cites no authority to support its proposition that it is entitled to recover what amounts to a portion of the cost of defense of the underlying lawsuit filed against its insured. As a result, Special Trucks is entitled to summary judgment in its favor on the issue of coverage for the $43,020.00 paid to Calavar pursuant to the settlement agreement.

*Defendant's Motion to Amend Answer*

 Special Trucks filed its Motion for Leave to File Amended Answer with Counterclaim on December 12, 1995. The court finds that this motion is untimely and is therefore denied. The parties in this suit signed a pretrial schedule on July 13, 1995, and the court approved the agreement, which was filed of record in this cause. The schedule expressly stated that Defendant had until October 1, 1995 to add additional parties and/or amend the pleadings. Furthermore, the court believes that this Order is dispositive of the issues in this case. Defendant, then, must pursue any claims against Plaintiff in a separate action. The court hereby takes judicial notice that just such a separate action was indeed filed by Special Trucks on January 23, 1996, in cause number 1:96–CV–32.

### CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment on the issue of the applicability of the policy's "product" exclusion is GRANTED; Defendant's motion for summary judgment on the issue of the applicability of the "work" exclusion is DENIED; Defendant's motion for summary judgment on the issue of coverage for loss of use damages is GRANTED; both Plaintiff's and Defendant's motions for summary judgment on the issue of consequential damages are GRANTED in part and DENIED in part; and Defendant's motion for summary judgment on the issue of coverage of the settlement payment is GRANTED; Finally, for the reasons discussed above, Defendant's Motion for Leave to File Amended Answer with Counterclaim is DENIED.[6]

---

6. In this case, even more than most, the words GRANTED and DENIED translate directly into amounts of money. For purposes of edification, the liability amounts break down like this: Special Trucks is liable for the cost of repair of its product, which amounts to $37,763.63, while United Capitol is liable for the remainder of the property damage awarded by the jury in the underlying case—a total of $249,546.37; Special Trucks is liable for consequential damages totaling $3,275.00 and United Capitol is liable for consequential damages totaling $23,910.42; United Capitol is liable for loss of use damages of $142,815.00; and United Capitol is not entitled to reimbursement of the $43,020.00 paid in settlement to Calavar.